**Charles McNary BOLING and Wife, Nancy Carr Boling, Plaintiffs–Appellants,**

**v.**

**TENNESSEE STATE BANK, Billy Proffitt and L. Thomas Bush, Defendants–Appellees.**

Supreme Court of Tennessee, at Knoxville.

Nov. 28, 1994.

William A. Reeves, Barry W. Eubanks, Ritchie, Wise, Reeves & Eubanks, P.C., Knoxville, for plaintiffs-appellants.

Bernard E. Bernstein and J. Thomas Jones, Bernstein, Stair & McAdams, J. Michael Winchester and E. Brian Sellers, Lacy & Winchester, P.C., Knoxville, for defendants-appellees.

## OPINION

REID, Justice.

This case presents an appeal from the judgment of the Court of Appeals reversing the trial court awards of compensatory and punitive damages. This Court finds the record supports the award of compensatory damages, as modified, and punitive damages as found by the trial court.

I

The Glenstone Lodge, a hotel located in Gatlinburg, Tennessee, began operating under the jurisdiction of the bankruptcy court in 1987. In April 1989, the bankruptcy court refused to confirm the sale of the Glenstone for $3 million due to the existence of an appraisal in excess of that amount. In July 1989, when the bankruptcy trustee advertised for bids on the property, the plaintiffs, Charles (Mack) Boling and Nancy Boling, who were in the motel business in Gatlinburg at that time, became interested in purchasing the Glenstone.

The Bolings, who were customers of the defendant Tennessee State Bank, discussed with Tommy Bush, the bank's president,[1] their need for a loan. Bush responded that the bank would be glad to consider their application. Prior to discussing the financial details of the venture, the Bolings requested complete confidentiality about the loan and all information which they would furnish to the bank. They specifically expressed concern that certain members of the bank's board of directors, who also were in the motel business, might be interested in bidding on the Glenstone. Bush advised the Bolings that the board of directors would have to approve any loan made to them but he promised that no director who had an interest in purchasing the Glenstone would see any of the information provided by the Bolings or participate in the consideration of their application for a loan.

A few days after their initial meeting, Bush assured the Bolings that he had checked with the board and no member was interested in buying the Glenstone. The Bolings then made application for a loan of $4.5 million and provided the bank with various financial information, including their personal financial statements and detailed projections of income and expenses for the operation of the Glenstone. After meeting with the board of directors, Bush advised the Bolings that the bank would lend them $1.5 million, the bank's regulatory limit, and offered to contact other banks about participating in a loan for the remaining $3 million. While they were still making arrangements for the additional financing, the Bolings submitted a bid to the bankruptcy trustee of $4.3 million, contingent upon their obtaining financing within 30 days. Before the 30 days had expired, another bid of $4.8 million was submitted, which caused the Bolings' bid to be rejected. However, the other party was not successful in completing the purchase, and the Bolings continued to negotiate with other banks for the additional financing needed.

In December 1989, unknown to the Bolings, the defendant Billy Proffitt, who was the majority stockholder in the defendant bank and a member of its board of directors, joined the Foley group, several investors who had come together for the purpose of purchasing the Glenstone. At that time, Proffitt told Bush only that he was considering joining the Foley Group. In January 1990, Proffitt participated with the Foley Group in submitting a private offer to the bankruptcy trustee, which was not accepted.

On January 30, 1990, the Bolings met again with Bush, advised him of their discussions with other banks and reduced their loan request to a total of $4 million. On March 7, 1990, Bush presented the Bolings' new loan request to the board of directors. Bush asked any board member who was interested in purchasing the Glenstone to leave the room. All the directors, including Proffitt, remained silent and none left the meeting. Bush then distributed the Bolings' confidential information to each board member. Proffitt reviewed the material and circled a $500,000 figure on the loan proposal,

---

1. Tommy Bush, President of Tennessee State Bank, was dismissed as a party defendant by the trial court.

which indicated the amount set aside for working capital thus leaving only $3.5 million of the loan available for the purchase of the property.

The first lienholder, with permission of the bankruptcy court, began foreclosure proceedings which would culminate in a public auction scheduled for March 30, 1990. On March 12, 1990, the bank issued a written loan commitment to the Bolings in the amount of $1.5 million. On March 27, 1990, Mack Boling advised Bush in his office at the bank that a bank in Pikeville, Kentucky, had informally approved a participating loan for the additional amount needed. Proffitt, who was in Bush's office at the time, listened to the discussion between Boling and Bush regarding the Bolings' plans, including their strategy for bidding at the auction. Because the property was subject to a tax lien in the amount of $100,000 the Bolings told Bush they had decided their top bid would be $3.4 million. After Boling left the bank office, Proffitt told Bush that he was a member of the Foley group which was competing with the Bolings. Proffitt refused Bush's advice that he inform the Bolings.

On March 30, 1990, the day of the auction, the Bolings met in their attorney's office with various other advisors, including Bush. While Bush was there, Proffitt called him by telephone to determine if the Bolings intended to bid. Bush replied that "there was a race on," which let Proffitt know that the Pikeville bank loan had been approved and the Bolings would be able to bid at the sale. As the parties approached the site of the auction, Mack Boling heard the attorney for the Foley group say, "It will take $3,500,000 to get it." Proffitt did not appear at the foreclosure sale.

After the first lienholder made its opening bid for the amount of its indebtedness, something in excess of $3 million, the only bidders were the Bolings and the Foley group. The Bolings bid $3.4 million and the Foley group responded with a bid of $3.405 million, which ultimately was accepted as the high bid. Before the property finally was struck off, the Bolings offered to pay the Foley group $50,000 for their expenses if they would not raise the Bolings' next bid. The Foley group declined the offer and offered to pay the Bolings' expenses in the amount of $30,000 if they made no further bid. The Bolings accepted the offer of $30,000, which the Foley group subsequently refused to pay.

The Bolings learned after the sale that Proffitt was a member of the Foley group.

Subsequent to the sale, the Bolings undertook to purchase from the Internal Revenue Service its right of redemption on the Glenstone. The Foley group raised their offer and ultimately bought the right of redemption for $200,000.

## II

The plaintiffs' suit alleged breach of fiduciary duty and fraudulent and negligent misrepresentation which denied them the opportunity to compete effectively for the purchase of the Glenstone. They sued for compensatory and punitive damages.

The trial court made extensive findings of fact regarding the conduct of Proffitt and Tennessee State Bank. The court found there was a confidential relationship between the Bolings and the bank and between the Bolings and Proffitt. It found that the fiduciary relationship was violated by the bank when its president failed to advise the Bolings that Proffitt was using the confidential information disclosed to the bank in asserting a conflicting interest, and by Proffitt in using that information in asserting a conflicting interest. The court also found this conduct by the bank and Proffitt proximately caused actual damages to the Bolings in the amount of $30,000 and justified the imposition of punitive damages against Proffitt in the amount of $250,000 and against the bank in the amount of $250,000.

Upon release of this Court's decision in *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896 (Tenn.1992), the trial judge made additional findings with regard to punitive damages. The court specifically found that Proffitt and Tennessee State Bank had acted "intentionally, fraudulently and recklessly as defined" in *Hodges,* and that in originally assessing punitive damages the court had considered all the factors subsequently appearing in the *Hodges* opinion. The court found "especially

... relevant to this case" the bank's and Proffitt's net worth, the "nature and reprehensibility" of their wrongdoing, their concealment of the wrongdoing, and the expenses incurred by the Bolings.

The Court of Appeals, in a divided decision, reversed the trial court and dismissed the suit. The majority concurred with the chancellor that the defendants' conduct was fraudulent but found that the fraud committed did not cause the Bolings any damage and, therefore, there could be no award for compensatory or punitive damages. The dissenting judge agreed with the trial court that the expenses incurred by the Bolings constituted damages and that the plaintiffs are entitled to awards of compensatory and punitive damages.

### III

The precise issue presented by this case has not been previously considered by the Court. However, the Court of Appeals in *Macon County Livestock Market, Inc. v. Kentucky State Bank,* 724 S.W.2d 343, 349 (Tenn.App.1986), in discussing a related issue, stated that where there is a definite fiduciary relationship between a bank and its customer, the bank is under a duty to disclose relevant material facts regarding the transaction, and concealment of or failure to disclose the facts at issue is fraudulent. The concurrent findings by the trial court and the Court of Appeals determine that the duty breached by the defendants was incident to a confidential relationship between the parties and that the violation of that relationship was fraudulent.

In a similar case, the Superior Court of Pennsylvania approved a judgment in favor of a bank customer for compensatory and punitive damages based on the bank's fraudulent misrepresentation. *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243 (1983). The bank made the plaintiff a loan with which to finance an automobile leasing business. Even though the bank officials assured the plaintiff that it had no interest in going into the leasing business, the bank used the plaintiff's concept and started a competing business. The

court awarded compensatory damages of $40,000 and punitive damages of $440,000.

The trial court in this case found that the defendants' fraudulent conduct was not the proximate cause of the plaintiffs' lack of success in purchasing the Glenstone, but awarded the plaintiffs $30,000 in compensatory damages. The Court of Appeals concurred in the finding that the fraud committed by the defendants was not the proximate cause of the plaintiffs' failure to purchase the hotel but found further that the defendants' conduct was not the proximate cause of any other damages sustained by the plaintiffs, and concluded, therefore, there could be no recovery. This additional finding by the Court of Appeals was error. As pointed out by the dissenting judge, the finding by the trial court related to the measure of damages only. Had the trial court found that the defendants' wrongful conduct was the proximate cause of the plaintiffs not becoming the successful bidder, damages would have been measured by the value of the loss of bargain plus incidental damages, rather than, as found by the trial court, incidental damages only.

The concurrent findings by the trial court and the Court of Appeals with regard to the proximate cause of the loss of bargain do not foreclose the finding of consequential or incidental damages. The following section of the Restatement (Second) of Torts sets forth the proper measure of damages for fraudulent misrepresentation:

(1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what he has received in a transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

(2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

Restatement (Second) of Torts § 549 (1977), *Measure of Damages for Fraudulent Misrepresentation.*

■ The record shows that the plaintiffs expended $14,825 in preparing to bid on the hotel. These funds were expended upon the bank's assurance that the personal information given by the plaintiffs to the bank and the plaintiffs' plans and intentions regarding the purchase of the property revealed to the president of the bank in Proffitt's presence would not be disclosed to or used by a competitor. The duty owed the plaintiffs because of the confidential relationship was breached by the bank's president and its director. Plaintiffs' expenditure of those funds was a loss proximately caused by the defendants' fraudulent conduct. With regard to the test for proximate cause, this Court stated in *McClenahan v. Cooley,* 806 S.W.2d 767, 775 (Tenn.1991):

> Taken as a whole, our cases suggest a three-pronged test for proximate causation:
>
> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and
>
> (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and
>
> (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

Since this case was tried by the chancellor sitting without a jury, review of the compensatory damage award is governed by T.R.A.P. 13(d), which provides in pertinent part:

> Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of correctness of the finding, unless the preponderance of the evidence is otherwise.

The trial court found that the plaintiffs suffered actual damages of $30,000 which was the amount promised to them for their expenses by the Foley group on the day of the auction. The evidence preponderates against a finding that $30,000 represents the damages actually suffered by the plaintiffs due to the defendants' fraudulent conduct. A *de novo* review of the record shows that the plaintiffs sustained compensatory damages in the amount of $14,825.

## IV

■ The record supports the trial court's award of punitive damages, whether reviewed under the standards stated in *Hodges v. Toof* or the law as it existed prior to *Hodges.* The Court stated in *Hodges:*

> Tennessee presently allows punitive damages in cases involving fraud, malice, gross negligence, oppression, evil motives, conscious indifference, and reckless conduct implying "disregard of social obligations."

833 S.W.2d at 900–01 (citation omitted). The Court then set forth the standards adopted in that case:

> In Tennessee, therefore, a court may henceforth award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly.
>
> .    .    .    .    .
>
> Further, because punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence.

833 S.W.2d at 901.

The evidence supporting the award of punitive damages in this case is clear and convincing. Included in that evidence is a policy statement concerning confidentiality and conflict of interest adopted by the Tennessee State Bank's board of directors on March 15, 1990, only 15 days prior to the date on which the Foley group, of which Proffitt was a member, raised the plaintiffs' bid by $5,000 and became the purchaser of the Glenstone. A portion of that policy is:

> All corporate, customer, employee, shareholder and supplier information, other than information that is public knowledge as a result of authorized disclosure, is to be considered the property of Tennessee

State Bank and confidential, should be safeguarded at all times, and may be used only for the legitimate business purposes of the company by authorized personnel. This expectation of privacy is fundamental to business relationships ... Confidential information must not be used to further private interests or for personal gain. Using confidential information obtained in the course of employment of Tennessee State Bank in making personal investments is prohibited. The use or disclosure of such information can result in civil or criminal penalties, both for the employee and for the company.

The record supports the trial court's awards of punitive damages.

## V

The judgment of the Court of Appeals is reversed. The judgment of the trial court awarding plaintiffs compensatory damages of $30,000 against the defendants jointly is reduced to $14,825 and the trial court's awards of punitive damages against Tennessee State Bank in the amount of $250,000 and Billy Proffitt in the amount of $250,000 are affirmed.

Costs are taxed against Tennessee State Bank and Billy Proffitt.

ANDERSON, C.J., and DROWOTA, O'BRIEN and BIRCH, JJ., concur.