# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE

FILED

**February 23, 1999**

**Cecil Crowson, Jr.
Appellate Court
Clerk**

THOMAS M. GAGE and wife,       )
JUDY A. GAGE,                  )
                               )
    Plaintiffs/Appellants,     )       Union Chancery No. 2323
                               )
v.                             )
                               )
ROBERT C. SEAMAN and wife,     )       Appeal No. 03A01-9711-CH-00503
RUBY M. SEAMAN, et al.,        )
                               )
    Defendants/Appellees.      )
                               )

APPEAL FROM THE CHANCERY COURT OF UNION COUNTY
AT MAYNARDVILLE, TENNESSEE

THE HONORABLE BILLY JOE WHITE, CHANCELLOR

For the Defendants/Appellees                For the Defendant/Appellee
Robert and Ruby Seaman:                     Knoxville Realtors, Inc. d/b/a Knoxville Realty:

D. Scott Hurley                             Bill W. Petty
Knoxville, Tennessee                        Knoxville, Tennessee

For the Plaintiffs/Appellants:

Stephen J. Lusk
Knoxville, Tennessee

**AFFIRMED IN PART, REVERSED
IN PART, AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J.

**OPINION**

This is an action for breach of contract and fraudulent misrepresentation arising out of the sale of a house. The purchasers filed suit against the sellers and the real estate company, seeking compensatory damages. After a bench trial, the trial court entered a $12,000 judgment against the defendant sellers, and ordered them to pay $8000 of the plaintiffs' attorney's fees. The claims against the real estate company were dismissed. Plaintiffs appealed. We affirm in part, reverse in part, and remand.

In 1983, Robert and Ruby Seaman ("the Seamans") hired a contractor to construct a home on property they owned. The Seamans decided to sell the home in 1991, and they enlisted the help of real estate agent Linda Bell ("Bell"), an employee of Knoxville Realty. The plaintiffs, Thomas and Judy Gage ("the Gages"), noticed the home in an advertisement and contacted agent Bell about the property. After visiting the property, the Gages decided to purchase the home. The purchase closed on March 17, 1992, and the Gages moved into the home on Memorial Day weekend 1992. The Gages did not have the home inspected prior to the purchase.

Approximately twenty days after the Gages moved in, they noticed that sewage was backing up inside the house. A plumber remedied the situation. Approximately six months later, the Gages noticed raw sewage seeping out from under rocks in the back yard. They contacted the Union County Health Department. The Tennessee Department of Environment and Conservation visited the premises on January 25, 1993, and determined that there was no drain field to the sewer system and that the home was not fit to be used as residential property. The Gages applied for a new septic system permit, but the state denied the permit. Eventually, the home was declared uninhabitable, and the Gages were forced to vacate the premises by order of the Tennessee Department of Environment and Conservation.

The Gages then filed this suit against the Seamans, Knoxville Realty, Jack Teague, the appraiser, Title Professionals, and Curtis Mortgage Company. All parties except the Seamans and Knoxville Realty were dismissed prior to trial. The claims against the Seamans and Knoxville Realty alleged breach of contract and fraudulent misrepresentation. The Gages assert that Knoxville Realty is vicariously liable because of and through the acts of its employee, Linda Bell.

Bell testified at trial that the Seamans, an older couple, told her that there were no problems with the house and that they were selling the house because of personal health reasons. Bell noted that the Seamans signed a Realty Disclosure Statement, which listed no defects or problems that

would affect the value of the property. Bell testified that the property was in immaculate condition and that she smelled no odors in or around the home. She stated that she had no reason to know that there were any problems with the septic system, and that all known problems were disclosed to the Gages. She denied telling the Gages that there would be an inspection by the Veteran's Administration or that she would "take care of them" during the closing procedures. She stated that no one had her get information from the Health Department on the septic system. Bell asserted that, in the absence of such a request, it is not standard procedure for a real estate agent to obtain information from the Health Department.

Mrs. Seaman testified at trial that she was not aware of any problems putting in the septic tank, nor was she aware of any problems with the commodes backing up. She acknowledged one occasion on which the roof leaked. She stated that she never smelled sewage either inside or outside of the home. She admitted that she and her husband had filed a lawsuit against the builder for unfinished work, faulty deck construction, and for installing a septic tank that was smaller than their specifications, among other claims. The suit was settled out of court. In addition, Mrs. Seaman testified that Mr. Seaman filed a Better Business Complaint against the builder because he installed the wrong size septic tank. Mr. Seaman did not testify, apparently due to his health.

At trial, the builder testified that, during construction, a representative from the Union County Health Department came to the lot and indicated that a septic system could not be approved for the site and that if a residence were built on the lot, the septic tank would need to be attached to the adjoining lot's septic tank, which was also owned by the Seamans. As a result, a septic tank permit was never obtained. The builder testified that he did not believe that Mr. Seaman was present when the Health Department representative came to the property, but that he later discussed the situation with Mr. Seaman. He asserted that the decision not to hook up the septic system to the adjoining lot's septic tank was jointly made by himself and Mr. Seaman. On cross examination, the builder could not recall Mr. Seaman explicitly instructing him not to join the septic tank with the tank next door, but insisted that the decision not to was a joint decision. The builder also testified that three contractors came to inspect the lot for purposes of installing the septic tank. Two of them indicated that they could not put in the septic tank, suggesting that the Seamans either connect the tank to the adjoining lot's tank or sell the lot due to the difficulty of installing a septic tank in the rocky terrain.

2

Conflicting expert testimony was presented at trial as to whether Bell should have realized that the home had a defective septic tank system. James A. Worthington, a Certified Residential Appraiser and real estate broker who testified for the Gages, stated that the rocky terrain on which the house was situated should have alerted a real estate agent to the possibility that a septic system could not be properly installed. However, Knoxville Realty proffered the testimony of Barney Thompson, Executive Vice President of the Knoxville Association of Realtors, who testified as to the standard of care for realtors in the Union County area community. He stated that a real estate agent has no duty to investigate beyond obtaining a statement by the sellers that there are no problems with the house. He indicated, however, that if the agent is aware of a problem, he or she must confront the seller about it. Mr. Thompson stated that if he viewed a house having a steep, rocky backyard such as the yard of the Seamans' former residence, and surrounded by homes built on similar terrain, he would take the seller's word that they had a septic tank and had experienced no problems.

At trial, Mrs. Gage testified on the issue of the Gages' damages, utilizing an itemized list of expenses. Overall, the Gages spent $8143.98 on repairs and improvements. Mrs. Gage testified that they spent $1528 on furniture storage and for the apartment that they moved into after being forced to vacate the residence. This included $350 for "[h]igher utility bills due to single pane and extensive amount of windows and cable hook up." Mrs. Gage stated that they spent $605 on the house they leased after they moved from the apartment, including money used for additional fans, fencing the backyard, curtains, blinds, paint, and cable hook up. Mrs. Gage included $400 for a refrigerator they gave away since the residence came with one, as well as $1800 for money they gave to their son when he moved out of the apartment they rented. The Gages claimed $5894.50 in moving expenses, including $150 for trips to the Veterans Administration to negotiate closing documents, $3354.50 in closing costs, $270 for a moving van, $120 for phone and utility hookup, and $2000 in rental payments the Gages made at their prior home for the two months the Seamans occupied the residence prior to closing. The Gages asserted that their credit had been damaged by the foreclosure but placed no monetary value on the damage to their credit. Their homeowner's insurance policy reimbursed them $1800. Taking this into account, the total damages for improvements, repairs, moving expenses, closing costs, and miscellaneous expenses the Gages sought were $16,571.48. In addition, the Gages requested damages of $4190.41 for their equity

interest in the residence based on an amortization schedule provided at trial considering fourteen payments. At trial, Mrs. Gage stated that by the time of trial they had paid $13,000 in attorney's fees.

The trial court found that the Seamans, in building the house, knew that the septic system was illegally installed and failed to disclose that fact:

> But the fault simply lays with the Seamans. This system was put in. They put it in with knowledge there was no Health Department certificate for it, that it was an illegal system, and that they could never get a permit to repair it. And it was covered up and it was not divulged in this Disclosure Statement. Gentlemen, that's simply fraudulent misrepresentation.

The trial court awarded damages of $12,000 against the Seamans, without detailing how this figure was calculated. The trial court noted that the Gages had presented no proof that Knoxville Realty, through its agent Linda Bell, had knowledge of the problem with the septic system at the time of the sale, and dismissed the Gages' claims against it. In addition, the trial court ordered the Seamans to pay the Gages $8000 in attorney's fees.

In response, both parties filed post-trial motions. The Seamans filed a motion to reconsider or alter and amend judgment. Their motion claimed that the trial court incorrectly relied on the testimony of the Gages' expert in finding that the Seamans knew of problems with the septic tank. They also contested the award of attorney's fees. The Gages filed a motion to reconsider or rehear. In the Gages' motion, they contended that the $12,000 award did not adequately compensate them, and requested that the trial court increase the award. The trial court overruled both motions to reconsider. The Gages then appealed to this Court.

On appeal, the Gages argue that the trial court erred in dismissing their claim against Knoxville Realty. The Gages also assert that the damages awarded did not adequately compensate them and sought additional damages or, in the alternative, an itemized explanation of the $12,000 damages award. The Gages contend further that the trial court erred in declining to award punitive damages or, in the alternative, treble damages under the Tennessee Consumer Protection Act.

Because this case was heard in a bench trial, we review the trial court's decision *de novo*, with a presumption of correctness in the trial court's findings of fact. No presumption of correctness attaches to the trial court's conclusions of law. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995); Tenn. R. App. P. 13(d).

4

On appeal, the Gages first contend that the trial court erred in dismissing the claim against Defendant Knoxville Realty. The Gages argue that Linda Bell, the employee and agent of Knoxville Realtors, knew or should have known about the septic problems on the property because the physical condition of the land should have alerted her to that potential problem. They maintain that Bell acted as an intermediary between the sellers and the buyers, that they relied upon her as a realtor, and that consequently she was under an affirmative duty to make the buyers aware of all potential problems with the property.

In response, Knoxville Realty notes the Disclosure Statement signed by the Seamans at the time the property was listed by Knoxville Realty. The Disclosure Statement declared that there were no defects in the property which would materially affect the value or desirability of the property. Knoxville Realty maintains that a realtor may rely on the representations of the seller when evaluating the condition of a potential real estate listing. The Gages submitted no proof that Bell had actual knowledge of a problem at the time of the sale, and Knoxville Realty argues that the Seamans' knowledge about the problem cannot be imputed to Bell.

The trial court noted that the Gages presented no proof that Knoxville Realty, or its agent Bell, had actual knowledge of any defect relating to the property. It found that neither Knoxville Realty nor Linda Bell, in her capacity as sales agent, breached a duty or responsibility to the Gages, and dismissed the Gages' claims against Knoxville Realty.

It is undisputed that Tennessee requires real estate agents and brokers to disclose known facts about the property that could materially affect the sale of the property. *See Wyner v. Athens Utilities Bd.*, 821 S.W.2d 597, 598-99 (Tenn. App. 1991) ("A fiduciary relationship aside, a realtor has a duty to deal honestly with both buyer and seller."); *Hughey v. Rainwater Partners*, 661 S.W.2d 690, 691 (Tenn. App. 1983) ("Where a broker acts as an intermediary between a seller and a purchaser, the broker is under a duty to deal fairly and honestly with both parties."); *see also* Tenn. Code Ann. §§ 62-13-402 to -403 (1997) (effective Jan. 1, 1996). Linda Bell signed an agency disclosure statement that placed on her a duty "to disclose all facts known to the agent materially affecting the value or desirability of property that are not known to, or within the diligent attention and observation of, the parties." Without question, Bell had a duty to disclose to the Gages known material defects in the property.

However, the Gages presented no proof that Bell had actual knowledge of the problems with

5

the septic system. When the Seamans listed their property with Knoxville Realty, they signed the Disclosure Statement, asserting that there were no defects in the property which would materially affect the value or desirability of the property. Bell testified that she took the Seamans at their word, and did no further investigation of potential problems with the property. Therefore, the proof is undisputed that Bell had no actual knowledge of the problem.

The Gages argue, however, that Bell should have anticipated septic system problems due to the hilly nature of the lot and the rocky outcroppings present behind the home. In effect, they argue that Bell had constructive knowledge of the problems with the septic system. Both parties presented expert testimony on whether Bell, from seeing the premises, should have known of a problem with the septic system. The trial court found that a reasonable real estate agent would not necessarily have known from looking at the property that the site was not suitable for a septic system. Noting that there was no proof that Bell had actual knowledge, the trial court dismissed the claims against Knoxville Realty.

Without reaching the issue of whether Knoxville Realty could be liable based on what Bell should have known from seeing the property, we find that the evidence does not preponderate against the trial court's factual finding that a reasonable real estate agent would not have known of a problem simply from seeing the site. Since it is undisputed that Bell had no actual knowledge of the problem, the trial court appropriately dismissed the claims against Knoxville Realty. The trial court is affirmed on this issue.

The trial court found that the Seamans had actual knowledge of the defective nature of the septic system at the time the property was sold to the Gages, and that they nevertheless signed a disclosure statement asserting that the house was free from defects. " 'As a general rule, a party may be held liable for damages caused by his failure to disclose material facts to the same extent that a party may be liable for damages caused by fraudulent or negligent misrepresentation.' " *Gray v. Boyle Inv. Co.*, 803 S.W.2d 678, 683 (Tenn. App. 1990) (quoting *Macon County Livestock Market, Inc. v. Kentucky State Bank, Inc.*, 724 S.W.2d 343, 349 (Tenn. App. 1986)).

The trial court awarded the Gages a total of $12,000 in compensatory damages and $8,000 in attorney's fees. The order did not indicate how the trial court arrived at these amounts. On appeal, the Gages argue that the damage award is not in accord with the proof in the record, and request that this Court remand the case for a reassessment of damages or for an itemization of the

$12,000 award. The award of attorney's fees was not appealed.

In response, the Seamans argue that the Gages failed to meet their burden of proving damages with a reasonable degree of certainty. They contend that some of the requested damages are speculative and consequential in nature, such as higher utility bills incurred because of single pane windows in the apartment they moved into.

The complaint in this cause alleges fraud and requests that the deed of trust and warranty deed be declared null and void. It also seeks the return of the purchase money to either the Gages or to their mortgage company, as well as compensatory and punitive damages.

In Tennessee, it has been held that:

> [a]n individual induced by fraud to enter into a contract may elect between two remedies. He may treat the contract as voidable and sue for the equitable remedy of rescission or he may treat the contract as existing and sue for damages at law under the theory of deceit in the ordinary case. The former is a contract action, while the latter is grounded in tort.

*Justice v. Anderson County*, 955 S.W.2d 613, 616 (Tenn. App. 1997) (citing *Vance v. Schulder*, 547 S.W.2d 927, 931 (Tenn. 1977)). The plaintiffs in this case sought both contractual remedies and compensatory and punitive damages. Although rescission may have been available under the facts of this case, *see Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn. App. 1991), the trial court chose to award compensatory damages and did not order rescission of the contract.

The Restatement (Second) of Torts sets forth the proper measure of damages for fraudulent misrepresentation:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what he has received in a transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

*Boling v. Tennessee State Bank*, 890 S.W.2d 32, 35 (Tenn. 1994) (quoting Restatement (Second) of Torts § 549 (1977)). Therefore, in a case of fraud, the measure of damages is to compensate the injured party for actual damages by attempting to place that party in the same position that he or she would have been in had the fraud not occurred. *See Harrogate Corp. v. Systems Sales Corp.*, 915 S.W.2d 812, 817 (Tenn. App. 1995).

In this case, as to the difference in value, the Gages contracted to pay $105,000, but of course had not yet paid the full amount. The Gages' payments began on April 1, 1992, with monthly

payments of $1,016.34. These payments continued until the Gages moved out of the home in May 1993, for a total of $14,228.76. At trial the Gages requested the accumulated principal, or equity, in the house of $4190.41. Clearly the Gages would be entitled to this amount, since it is undisputed that the house is uninhabitable and the site may be used only for a purpose that does not involve occupancy, such as storage.

Under the Restatement, the Gages are also entitled to "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation." *Boling*, 890 S.W.2d at 35 (citing Restatement (Second) of Torts § 549 (1977)). Mrs. Gage testified at trial about the extensive improvements she and her husband made to the home before they discovered the problems with the septic system, expenses related to the closing, expenses related to the move into and out of the house, expenses at their present house, and various additional expenses. The total of these expenses was $16,571.48. The Seamans produced no evidence that these payments were not made, but question whether many of them are appropriate damages.

From the amount of the award for compensatory damages, $12,000, we can surmise that the trial court included some, but not all of the pecuniary losses claimed by the Gages. However, the order contained no explanation of how the trial judge arrived at this amount. For many of the expenses claimed by the Gages, there was no supporting documentation, such as checks or receipts, only Mrs. Gage's testimony. Consequently, the resolution of which expenses may properly be awarded as damages must involve issues of credibility. The trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than an appellate court to decide issues related to credibility. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). From the record in this case, we cannot determine the expenses upon which the trial court's award of compensatory damage was based, and therefore cannot appropriately review the award of damages. Consequently, we must remand the cause to the trial court for an itemization of the pecuniary losses awarded to the Gages, in addition to the award of $4,190.41 for the loss of their equity in the home. On remand, the trial court may reassess the damages in addition to setting forth the items of pecuniary loss on which the award is based.

The Gages also argue that the trial court should have awarded punitive damages in this case because of its finding that the Seamans made a fraudulent misrepresentation. The decision to award

8

punitive damages is within the discretion of the fact-finder. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901-02 (Tenn. 1992). "An appellate court will not reverse a discretionary judgment of the trial court unless it affirmatively appears that such discretion has been explicitly abused to great injustice and injury of the party complaining." *Douglas v. Estate of Robertson*, 876 S.W.2d 95, 97 (Tenn. 1994). The party claiming an abuse of the trial court's discretion has the burden of showing such abuse. *See Ballard v. Herzke*, 924 S.W.2d 652, 659 (Tenn. 1996); *Rachels v. Steele*, 633 S.W.2d 473, 475 (Tenn. App. 1981).

Punitive damages are "restrict[ed] . . . to cases involving only the most egregious of wrongs." *Hodges*, 833 S.W.2d at 901. In Tennessee, a court may "award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Id.* Such actions must be shown by clear and convincing evidence. *See id.*

In this case, the trial court made no finding that the Seamans' conduct was egregious as required under *Hodges* to sustain an award of punitive damages. "We cannot extrapolate the trial court's findings regarding the defendants' intentional misrepresentations into the requisite finding of egregious conduct contemplated by *Hodges*." *Murvin v. Cofer*, 968 S.W.2d 304, 311-12 (Tenn. App. 1997). We cannot conclude that the trial court abused its discretion in failing to award punitive damages in this case. The decision of the trial court on this issue is affirmed.

In the alternative, the Gages argue that the trial court erred in not awarding treble damages under the Tennessee Consumer Protection Act. *See* Tenn. Code Ann. § 47-18-109(3) (1995).[1] The Tennessee Consumer Protection Act does not apply to those persons not in the business of selling property as owners or brokers. *See Ganzevoort v. Russell*, 949 S.W.2d 293, 298 (Tenn. 1997); *see also Murvin*, 968 S.W.2d at 308-09. The *Ganzevoort* court reasoned that "[t]wo of the stated purposes of the Act are to maintain 'ethical standards of dealing between *persons engaged in business* and the consuming public,' and 'to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices *in the conduct of any trade or*

---

[1] The Act provides:

> If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained . . . .

Tenn. Code Ann. § 109(3) (1995).

*commerce*.' " ***Ganzevoort***, 949 S.W.2d at 298 (quoting Tenn. Code Ann. §§ 47-18-102(2) & (4) (1995) (emphasis added)).  The record indicates that the Seamans built the house at issue for their own use and decided later to sell it due to their advancing age and declining health.  They were clearly not in the business of selling homes as a trade or commerce.  The only party in the business of selling real estate was Knoxville Realty.  As noted above, we affirm the dismissal of all claims against Knoxville Realty.  Therefore, under these circumstances, the provisions of the Tennessee Consumer Protection Act are inapplicable.  The trial court's decision on this issue is affirmed.

In sum, the trial court's dismissal of claims against Knoxville Realty is affirmed.  The trial court's decision not to award treble damages under the Tennessee Consumer Protection Act or punitive damages is also affirmed.  We hold that the award of compensatory damages may properly include the $4,190.41 in equity the Gages had in the home, and remand the cause to the trial court for an itemization of the pecuniary losses on which the remainder of the $12,000 award is based.  On remand, the trial court may, in its discretion, reassess and modify the award of damages.

The judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings, as set forth above.  Costs are assessed equally against the Appellants and the Appellees, for which execution may issue if necessary.


_____
**HOLLY KIRBY LILLARD, J.**

_____
**CONCUR:**


_____
**W. FRANK CRAWFORD, P. J., W.S.**


_____
**DAVID R. FARMER, J.**

10