## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 7, 2019 Session

## RACHEL MADDOX v. OLSHAN FOUNDATION REPAIR AND WATERPROOFING CO. OF NASHVILLE, L.P., ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 12-657-I       Claudia Bonnyman, Chancellor**

———————————————————

### No. M2018-00892-COA-R3-CV

———————————————————

This appeal involves a homeowner's fraud claim against a foundation repair company. The trial court rejected the foundation repair company's argument that the fraud claim was barred by the statute of limitations and the statute of repose. After a three-day bench trial, the trial court found that the foundation repair company had engaged in fraud. Specifically, the trial court found that the foundation repair company sold its systems to the homeowner representing that they would stabilize her house from further movement when in reality it did not have the knowledge or understanding to design an effective solution for the house and "simply did not really care" whether the systems would be effective in any way. The trial court further found that the company fraudulently misrepresented whether an engineer would be involved in the process and whether it would obtain a permit for the work. The home had been condemned by the time of trial, and the trial court awarded the homeowner $187,000 for the loss of the value of the structure. Based on the reckless and fraudulent conduct of the foundation repair company, the trial court also awarded $15,000 in punitive damages to the homeowner. The foundation repair company appeals. We affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Kevin C. Baltz and C.E. Hunter Brush, Nashville, Tennessee, for the appellant, Olshan Foundation Repair and Waterproofing Company of Nashville, LP.

Jean Dyer Harrison, Nashville, Tennessee, for the appellee, Rachel Maddox.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Rachel Reeves (now Maddox) purchased a home in West Nashville on January 31, 2003. The purchase price of the home was $170,000. The two-acre lot where the house was situated was very steep, with a steep driveway leading up to the home. The lot continued to slope steeply upward behind the home toward an adjacent property at the top of the hill. When the home was built in the 1970s, the builders excavated into the hillside and spread the excavated soil out in front to make a level building pad. This was typical for that time period and for that area of Nashville, as several other homes in the area have similar site conditions on hilly terrain.

The home itself was a modified A-frame structure with three bedrooms and a loft. It consisted of three stories, with the lowest level constructed like a basement except that it was not fully underground. The lowest level had concrete block foundation walls and a slab floor, and one side of it was used as a two-car garage. The upper stories were wood framed and sided. These levels had "two-story glass" along the front of the house with a view of the valley below. The home also had large decks on the front and back of the house.[1]

The home was in good condition when Ms. Maddox purchased it, with no visible defects noted by either Ms. Maddox or her home inspector. In late 2004, however, Ms. Maddox started noticing some problems with the home. During heavy rains, water "bubbled up under the foundation" at the front of the house. In addition, Ms. Maddox noticed some "hairline cracking" in the garage side of the lowest level and some even finer cracking in the other side of the basement. Ms. Maddox was not overly concerned and attributed the cracking to settlement.

In early 2005, the cracks in the basement level appeared a little larger, up to a quarter of an inch in width, and cracks began to appear in the blocks of the brick wall. Ms. Maddox also began to sense, for the first time, that her home was "tilting" downhill. If a tennis ball was placed on the floor, it would roll toward the front of the house. Ms. Maddox decided to find someone with foundational expertise to inspect the property in order to determine if the issues were normal settlement or something more.

Ms. Maddox had seen a television commercial for Olshan Foundation Repair and Waterproofing Company advertising a lifetime warranty, so she contacted Olshan in May 2005. Olshan sent Kevin Hayman to Ms. Maddox's property. Olshan's documents described Mr. Hayman as a "certified structural technician." Ms. Maddox toured the property with Mr. Hayman and showed him the tilting in the front room of the house, the

---

[1] At trial, Ms. Maddox described the construction of her home as being "like a chalet."

cracks in the basement floor, the stair-stepping cracks in the basement walls, and the area where she had observed bubbling around the front of the foundation when it rained. Mr. Hayman also pointed out that the back wall of the home was "bowing" inward. Mr. Hayman assured Ms. Maddox that Olshan employees had advanced training and handled these types of issues all the time.

Mr. Hayman described three systems recommended by Olshan to stabilize the house. First, Olshan would use its Cable Lock system to support the front part of the home's foundation with pillars. Olshan's brochure provided the following explanation of its Cable Lock system:

> The installation process involves individual sections of concrete being driven to depths of up to 90 feet beneath your foundation and locked together by the cable. The cable makes the difference. When the last piling is installed and the cap is set in place directly under the footing, you know your home is secure. No other foundation repair method can do this. The cable makes the Cable Lock™ System superior to all pressed piling systems and is 3 ½ times more reliable than concrete piers. The lifetime transferable warranty that comes with the Cable Lock™ method of repair is even better than our convenient, reliable and superior system. That lifetime warranty means something when it is backed by over 70 years of experience.

The brochure stated that the Cable Lock system would be custom fitted for each home, and the "[e]ngineered" Cable Lock system rotated 360 degrees every four feet. It stated, "City inspectors, engineers and you personally can verify job performance." The brochure further provided, "Every Cable Lock installation lasts a lifetime – it's backed by a lifetime transferable warranty from Olshan. Areas repaired with Cable Lock™ are covered against future settlement – forever."

The second system recommended by Mr. Hayman was called the Wall Lock system. Mr. Hayman explained to Ms. Maddox that this system would essentially stabilize the house by taking pressure off the back wall that was bowing inward and returning it to its original position. He explained that Olshan would drill through the back wall and place anchors "in the earth" behind the house to secure the wall. The Olshan brochure further explained that the Wall Lock system was a form of "tie back" system in which tie backs were installed at an angle reaching from the interior of the wall into "virgin soil" outside the wall. The brochure stated that the Wall Lock system would be "proven and tested when installed" and also "backed by a lifetime warranty from a company with over 70 years of experience."

Finally, Mr. Hayman recommended Olshan's Water Lock system to address the home's water issues, prevent water from coming into the house, and help stabilize the

home.  The brochure explained that Olshan employees would break through the concrete and dig down to the footer, drill weep holes, and install Water Lock pipe, before replacing all concrete and leveling the floor.  The brochure stated that the Water Lock system was "designed to stop water from entering permanently," and "[t]he Water Lock™ lifetime warranty ensures you will be protected… forever."  It stated, "Olshan proudly stands behind each and every repair just as we have been doing for the last seven decades."

Ms. Maddox believed that Mr. Hayman was going to consult with an engineer to ensure that these recommendations were appropriate.  Mr. Hayman returned to the home at a later date with an Olshan manager and a computer-generated drawing of the home depicting the locations where the three systems would be installed.  A circular stamp or seal appeared on the drawing with the words, "Kevin Hayman, Certified Structural Technician."  Mr. Hayman and the manager discussed their proposal with Ms. Maddox and assured her that these systems would fix the home's structural issues.  Ms. Maddox contracted with Olshan for the installation of all three systems at her home at a total cost of $27,000.  She signed a written contract on August 29, 2005.  The contract stated that Olshan would furnish a "BEC engineering letter" after the work was completed.  It also stated, "Work permitted to meet local government requirements."

Olshan installed the systems at Ms. Maddox's home over the course of three days in October 2005.  Olshan did not install as many pilings as it originally proposed because the steel supporting the front deck started to bend, so Ms. Maddox was only required to pay $23,700 of the original contract price of $27,000.  In March 2006, Kevin Hayman provided Ms. Maddox with the "BEC engineering letter" mentioned in the contract, and he also gave Ms. Maddox certificates reflecting specific terms for the lifetime warranties on the systems.  The certificate for the Cable Lock Lifetime Foundation Warranty stated that if any "adjustments" were required during the life of the home due to settling, Olshan would re-raise or adjust all areas previously underpinned without cost to the owner.  The certificate for the Wall Lock system stated that if any adjustments were required during the life of the home, Olshan would "re-tighten all areas previously repaired" without cost to the owner.  The certificate for the Water Lock system stated that if any water from the wall or the wall floor joint passed through the perimeter water control system and onto the basement floor, Olshan would "provide the additional labor and materials to fix the leak at no additional cost to the owner."

The BEC engineering letter Mr. Hayman provided to Ms. Maddox stated:

March 7, 2006

Olshan Foundation Repair
19 Cleveland Ave.
Nashville, TN. 37210

- 4 -

Subject:     Review of Foundation Repairs at 530 Hickory Trail Dr., Nashville, TN. 37209

BEC Engineering, Inc. (BEC) has reviewed the subject foundation repairs that were made to the above referenced residence. Olshan Foundation Repair and Waterproofing presented the repaired portion of the foundation using 13 segmental pre-cast Cable Lock™ concrete piles, 6 wall lock soil anchors (Manta Rays) and 42 linear feet of interior water lock, and an automatic sump pump at the above referenced location for BEC's review. The repairs were found to be in general compliance with industry standards, and in accordance with Olshan Foundation Repair's proposal.

In BEC's opinion, the repairs as reported are adequate for this type of structure and for the area where the work is being performed. The repair work performed to the subject location is believed to have been acceptably completed in accordance with good industry practice for this type or repair.

The future performance of the foundation system on the subject location should be as intended. Repairs to concrete and masonry surfaces should be made as soon as possible to help prevent moisture and insect intrusion. Soils should be graded such that there is positive drainage away from the foundation to prevent water from ponding around the foundation system.

BEC appreciates being of service. If you have any questions or require additional information please contact the undersigned.


Regards,

Adrian Farr, P.E.
BEC Engineering, LP

Mr. Farr attached to his letter the computer-generated drawing originally prepared by Kevin Hayman. Along with the original circular stamp or seal stating, "Kevin Hayman – Certified Structural Technician," this drawing had an additional seal that stated, "Adrian L. Farr – Registered Engineer – State of Tennessee." A handwritten notation beside his seal stated, "Recommendations are based on limited visual survey." Thus, Ms. Maddox believed that the engineer had reviewed the repairs to her home, found them appropriate from an engineering standpoint, and concluded that the home was secure.

Olshan returned to Ms. Maddox's home later in 2006 and adjusted the foundation pilings and the wall anchors. This first visit was initiated by Olshan. During the visit,

Olshan's employee informed Ms. Maddox that he needed to make some adjustments to the systems. Ms. Maddox could "feel the tilting" and saw that some of the cracks were slowly progressing. She had also observed water bubbling up underneath the slab when it rained. However, the 2006 adjustment fixed the tilt in the home at least temporarily.

In 2007, Ms. Maddox called Olshan to return to the home. Olshan adjusted the pilings and the wall anchors again. Once again, the adjustments fixed the tilt in the home for the time being. Ms. Maddox refinanced her home in 2008 and made several upgrades to the interior.

In May 2010, Nashville experienced an historic flood. Ms. Maddox's home was not flooded due to the steep slope of her property, but she observed a surge of water coming from underneath the house. After the flood, she also noticed a significant tilt in her home. She called Olshan again, on May 18, 2010, to report the problem. Olshan sent a representative to the home in June 2010 who tightened the wall anchors and adjusted several pilings.

In November 2010, Ms. Maddox called Olshan again because she noticed new cracks and believed that the tilt in the house was "becoming increasingly more dramatic." Ms. Maddox was in and out of the hospital during this time and did not physically observe anyone adjusting the systems, but Olshan assured Ms. Maddox that it would send out a representative and that "it would be fine." Ms. Maddox called Olshan again in December 2010 because the cracks had progressed from moderate to more significant, and she again detected the tilting. She reported that she could "see daylight" through the cracks. Olshan sent someone to the property in January 2011.

An Olshan work record indicates that its employees returned to the home again in March 2011 to adjust the pilings. The record states, "Opened pilings 2 and 3 but the footer is cracked and it seems to be walking away from the rest of the house." The record states that the homeowner was not present but that the worker notified the Olshan manager. However, no one ever informed Ms. Maddox about the cracked footer.[2] She continued to make improvements to the home throughout this time period.

Ms. Maddox called Olshan again in August 2011. In response, an Olshan representative returned to the home to perform some sealing and caulking. On or around August 22, an Olshan employee was present at the property and told Ms. Maddox, "Cannot fix. Call office." The representative spoke "very broken English" and could not answer Ms. Maddox's questions. After this conversation, Ms. Maddox made repeated

---

[2] At trial, Ms. Maddox testified that no one from Olshan ever told her that her house had a cracked footer, as reflected by Olshan's work record from March 2011. She said, "No one ever told me anything about what was happening with my home other than they were going to adjust it and fix it." Ms. Maddox learned about the notation of the cracked footer during discovery in this litigation.

attempts to contact Olshan, but she was unsuccessful, and no one from the office would return her calls.

By late 2011, Ms. Maddox became very concerned and contacted an engineer, Larry McClanahan, to inspect the home. According to Ms. Maddox, Mr. McClanahan told her that the foundation work performed by Olshan actually made the issues at the house worse. He informed her that the Olshan system was not working as intended and would never have worked. Mr. McClanahan informed Ms. Maddox that there was an immediate need to stabilize the structure before proceeding with a more thorough investigation of the conditions. He made some sort of recommendation for proceeding, but it was going to cost over $30,000, and Ms. Maddox was unable to afford the additional cost.

Ms. Maddox consulted with other engineers to seek a second opinion and determine whether the cost suggested by Mr. McClanahan was truly necessary. Ms. Maddox also continued to call Olshan repeatedly but to no avail. Ms. Maddox also had family members call on her behalf, but Olshan representatives would not return her calls. Ms. Maddox estimated that she called Olshan twenty to thirty times.

On May 3, 2012, roughly eight months after the Olshan employee told Ms. Maddox that he could not fix the house and left the property for the last time, Ms. Maddox filed this lawsuit against Olshan in the chancery court of Davidson County. Her complaint recounted the facts regarding Olshan's installation of the three systems at her home and alleged that the problems she had experienced since that time rendered the home "barely habitable" and "potentially unlivable." She alleged that the cracks in the foundation had expanded to over an inch wide and that the home was in danger of further structural failure that would in fact render the home uninhabitable. Ms. Maddox contended that Olshan knowingly or recklessly sold her products that were "neither needed nor effective" and ultimately caused additional harm to the home. She alleged that Olshan's systems could not perform as guaranteed and included a warranty that was essentially worthless and provided no protection at all. Ms. Maddox alleged that Olshan represented that it was uniquely skilled and had the best technology available to fix the home, fraudulently inducing her to purchase systems that were not needed and could not work. Ms. Maddox asserted claims for breach of warranty and common law fraud. She estimated that it would cost over $100,000 to repair the home and sought damages in an amount equal to the cost to repair plus all costs and expenses associated with ascertaining those damages. She also sought an award of punitive damages due to the misrepresentation and intentional conduct.

While the case was pending, in April 2013, Ms. Maddox was inside her home during a rainstorm and heard loud cracking sounds coming from outside. Ms. Maddox went outside and saw that a tree had split and was about to fall on her home. She immediately left the home in her pajamas with only her purse and her dog. The tree

eventually fell and brought another tree down with it, and both trees struck the home. Ms. Maddox never resided in the home again after this date.

Ms. Maddox talked to several engineers regarding repairs, but she was told that there was nothing that could be done at that point because she had "missed that window." She tried unsuccessfully to get contractors to work on the house. Pictures of the property taken around this time indicate that the walls were bowing and the wall anchors installed by Olshan had turned sideways or at an angle due to the pressure. At least one crack in the basement wall was wide enough that one could see "daylight" and look out into the yard from the interior of the home. Stair-stepping cracks extended through the whole corner of the front left side of the house. The soil had eroded around the foundation to the point that the base of the foundation was clearly visible in some areas, and the sewer line passing under the footing was also clearly visible. At the bottom of the steel post supporting the overhanging deck, there was an obvious gap where the concrete had "settled out from under the post" and was no longer supporting it. In the living area upstairs, cracks extended from the tops of the doorframes, and the drywall had begun to separate. The chimney line above the fireplace was no longer straight and indicated a visible shift.

According to the chief building inspector for Metro Codes in Nashville and Davidson County, who visited the home around this time, there were cracks in the walls and foundation, the doors were twisted "out of plumb," the garage door on the side of the home was no longer straight, and the home appeared to be "sliding off of the hill" on which it was built. In his opinion, the home was unsafe for habitation and probably would have qualified for demolition at that point. However, he did not officially post the house as unsafe because homeowners are usually given some initial opportunity to decide whether to pursue repairs, and he spoke with an engineer retained by Ms. Maddox who indicated that she was investigating the possibility of repairs.

Ms. Maddox had to pay "high-risk movers" to recover what little they could from the home. She sought to recover under her home insurance policy, but she was only paid around $16,000 for damage to the roof and gutters, and she was not compensated with respect to the condition of the structure itself. Ms. Maddox amended her complaint to allege facts regarding the further deterioration of the home, to add a fraud claim against BEC Engineering, LP, and to add additional allegations of fraudulent conduct on the part of Olshan. She alleged that Olshan fraudulently misrepresented that the work had been reviewed and approved by an engineer when in fact no engineer ever viewed her home. Ms. Maddox alleged that the BEC engineer who provided the letter regarding her property lived in Texas and never visited the site. She alleged that if Olshan had actually retained an engineer to inspect her property, Olshan would have learned that the home was in grave danger and needed very specific repairs due to unstable soils on the property. Ms. Maddox alleged that Olshan's products could not work on unstable soil and that this fact would have been readily apparent to any expert in the field who

examined the home. She claimed that Olshan's actions caused additional harm by leading her to believe that the home had been stabilized, when in fact the Olshan systems had no such effect, preventing her from performing the necessary repairs before the home was irredeemably damaged. Ms. Maddox claimed that her home had become uninhabitable and "a total loss" that could not be repaired "in any commercially feasible manner." She sought compensatory damages for the value of the home in addition to consequential and incidental damages. Thereafter, in February 2016, the city codes department posted a sign on the property officially designating it as "unsafe due to foundation failure and unstable soil."

The trial court entered a default judgment against BEC Engineering and reserved the issue of damages for trial. However, the trial court ultimately concluded that BEC Engineering was not so connected to the events at issue that it was responsible for Ms. Maddox's damages. As a result, the claims against BEC Engineering were dismissed. This ruling is not challenged on appeal.

The trial court held a three-day bench trial in August 2017 on the claims against Olshan for fraud and breach of warranty. The trial court heard testimony from Ms. Maddox; Byron Hall, Chief Building Inspector for Metro Codes in Nashville and Davidson County; Richard Courtney, a real estate broker; Jerry Michael Vines, Jr., structural engineer and expert witness for Ms. Maddox; Susan Bryan, a partner in Olshan of Nashville; and Keith Michael Garman, geotechnical engineer and expert witness for Olshan.

Ms. Maddox described the condition of her home at the time of trial as "very sad" and "a disaster." She explained that she cannot legally enter the home, and she had been advised that the home could slide down the hill at any minute. The doors are bowed to the point that the home cannot be locked. She believed that the home was worth nothing in its current condition. Ms. Maddox explained that there was nothing she could do with the property because she had tried unsuccessfully to sell it, and she was not permitted to rent it or build on the property.

Ms. Maddox had originally purchased the home for $170,000 in 2003. She refinanced in 2008 to pay for "upgrades" to the home, and at the time of trial, she still owed $170,219 on the home. She continued to pay $1900 per month for her mortgage payment even though she had not lived in the home in six years. Ms. Maddox introduced the property tax records for the home reflecting its appraised and assessed value for every year since 2005, when Olshan worked on the home. According to these tax records, in 2005, the total appraised value of the property was $162,300, with a land value of $35,000 and an improvement value of $127,300. The total appraised value had risen to $203,700 in 2009. However, it substantially decreased in 2011 and later years, and the total appraised value for 2017 was only $13,400, with $11,400 of that amount being attributable to the land, and only $2,000 being attributed to the structure.

Ms. Maddox testified about the sales price of several comparable homes on her street and in her neighborhood in the past few years. She calculated the average price per square foot for these sales. Using this figure, she estimated that when the trees fell on her home in 2013, the home would have been worth about $230,000, conservatively, if it had been in good condition. After that date, and through the time of trial, Ms. Maddox believed that her home had zero value. She had believed that her home was "fixable" before that date, but after that date, she did not, based on what she was told by several engineers about the possibility of repairs.

Ms. Maddox had met twice with Byron Hall, the Chief Building Inspector for Metro Codes in Nashville and Davidson County. Mr. Hall also testified at trial. He had visited Ms. Maddox's home four or five times, beginning in 2013 after the trees fell and most recently during the week before trial. As a result of his last visit, Mr. Hall turned the property over to the Property Standards Division of the Codes Department to be inspected and recommended for demolition. He explained that a property qualifies for demolition if the cost of repairs would exceed fifty percent of the amount the property would be worth in a repaired state. He noted that the property tax assessor valued this structure at only $2,000 and had obviously "written it off." He also noted that the 2013 value of the structure, according to the tax assessor, was $37,700, and it would not have been possible to repair the home for $18,500 even at that point.

Mr. Hall testified that the home now has cracks in all of the basement walls, with the widest spanning approximately two inches or more. At the front corner of the house, the concrete was exposed and cracked and appeared to be sinking or sliding to the low side. The ground was washing away from the footing, leaving a space beneath it wide enough for someone to reach his or her arm under the footing. The bottom of the footing was supposed to be at least twelve inches below finished grade. Mr. Hall deemed the home an imminent threat to public health and safety.

Mr. Hall explained that Ms. Maddox's lot has a slope of approximately 33 to 35 percent, which is difficult for building because of drainage issues and the condition of the ground itself. Such steep lots are deemed "critical lots" by the codes department, and new construction on such lots is typically overseen by the stormwater division. Mr. Hall acknowledged that he had never inspected the systems installed by Olshan, but, he added, that was "[p]art of the problem we had[.]" Mr. Hall explained that the city requires permits for that type of work, and Olshan had never pulled any permits or asked for inspections. He said, "If you're dealing with a foundation of a piece of property, there's a permit required. We require a permit to do no more than dig – to excavate soil back and put waterproofing on the basement. . . . So . . . anytime that the work is done to the foundation of a home, it requires a permit." The language of the relevant city ordinance required a permit for anyone desiring to "construct, alter, repair, enlarge, move or demolish any building or structure or part thereof[.]"

On cross-examination, Mr. Hall acknowledged that city ordinances provide an exception for "normal maintenance repairs." The relevant ordinance provided:

> 16.28.030 - Normal maintenance repair—Permits not required.
> . . . .
> Normal maintenance repairs shall be defined as repairs to an existing building or structure, including but not limited to exterior and interior painting, papering, glazing of windows and doors, floor finishing, minor repairs to chimneys, stairs, porches, underpinning and repairs to an existing roof not to exceed thirty-three percent of the roof area.

However, Mr. Hall insisted that the type of work done in this case, involving "jacking up the structure," jackhammering concrete to install a drain, and installing wall anchors, was not "[n]ormal maintenance repair" or even underpinning. Mr. Hall described underpinning as something used on modular buildings or trailers. He said this was his interpretation of the ordinance and that of the department's director, and an appeal would have to be taken to the board of appeals in order to overturn it. He also said that the department was in the process of having the word "underpinning" removed from the definition because many foundation companies were doing work without permits and claiming that their work was exempted by that term. He explained that contractors were expected to comply with the code but that this provided "a way around a permit for some of the contractors." On occasions when the codes department learned that foundation companies were proceeding without permits, they required the companies to obtain them or issued a stop work order.

Mr. Hall testified that if the codes department had been involved with the repairs to the Maddox property, it would have required not only a permit for this work, but also the involvement of an engineer, due to the conditions at the property. He also said that the department would have required the engineer to be on-site to perform the review.

Ms. Maddox also presented the testimony of Richard Courtney as an expert in real estate. Mr. Courtney had been a real estate broker for 39 years and sold about 1500 homes, mainly in the Nashville area. He visited Ms. Maddox's property at least twice, including once on the morning of his testimony. However, he had not been inside the house because it had been condemned and was posted with a sign. He opined that if the house had been "in perfect condition," it would have been valued at around $152 per square foot. Mr. Courtney testified that two homes on Ms. Maddox's street were sold in the current calendar year, one for $152 per square foot and another for $132 per square foot. Based on the square footage of Ms. Maddox's home, he estimated that her home would be worth $234,000 to $254,000 if in good condition. In its current state, considering the extent of necessary repairs, Mr. Courtney believed that the home had no value. He also explained that new construction on the lot would be cost prohibitive

because a builder could not purchase the property and build another house on it and make any profit.

Ms. Maddox presented additional expert testimony from Jerry Michael Vines, Jr., a structural engineer. (The trial court would later describe Mr. Vines as "a credible and very knowledgeable witness.") Mr. Vines had been a registered professional engineer for nearly twenty years, and he was licensed in four states. He had worked with foundation companies on homes with unusual or difficult conditions like those present at the Maddox property.

Mr. Vines had visited Ms. Maddox's home at least twice. He found it obvious that the house had settled along the front end and that the earth pressure on the back side of the house was pushing on the foundation walls, causing bowing and cracking. He said the pressure had continued to the point that horizontal cracks formed and extended the length of the rear basement wall, the garage doors were leaning, and the tops of the walls were leaning out farther than the bases of the walls. The interior support columns were leaning three inches toward the front of the home, indicating significant foundation settlement and lateral pressure on the house.

Mr. Vines had examined the locations where the three systems were installed by Olshan. He testified that the Wall Lock anchors had continued to move since installation. Mr. Vines coordinated with a contractor and laborers for excavation of one of the anchors to determine how it was installed. Once the anchor system was exposed, he discovered that it only extended approximately six feet into the soil beyond the wall, and the pivoting anchor head that was designed to pivot and anchor into the soil was not even engaged. It was still flat and parallel with the rod. Mr. Vines explained that with the anchor head unengaged, there was no way for the anchor to provide any significant resistance.

According to Mr. Vines, earth anchor systems are not "generic" or "one-size-fits-all" systems, and they should be engineered from the very beginning. He said you have to make sure you extend the anchors beyond any existing soil movement to reach into stable ground in order to provide resistance and sufficient tensile force to brace the wall. He explained that certain angles are required depending on specific soil conditions at the site, and an engineer is needed to calculate how deep the anchor should extend. When installing wall anchors, he said, you can't just "drill the hole and go for it." Rather, you need specific information on numerous variables, including soil conditions, the height of the wall, the height of the soil behind the wall, the pressure on the wall, etc., to utilize formulas and determine how deep the anchor needs to be. Anchoring the system into loose or moving soil will just pull the earth along with the wall, he said.

Mr. Vines explained that if someone installs earth anchors by simply pushing "to a point of refusal," then "it's bound to fail because it's just not gonna work." Mr. Vines had reviewed the entire file produced by Olshan and the BEC engineering letter, and he

found no indication that anyone performed any type of calculations related to the work. Although the BEC engineering letter was provided after all repairs were done, it provided no evidence of any type of analysis or design of the system prior to installation. Mr. Vines was critical of the BEC engineering letter due to the lack of any indication that the engineer performed calculations or testing, saw the repairs, or was really involved at all. He believed there is no significance to or use for such letters.

According to Mr. Vines, the earth anchors installed by Olshan barely reached the edge of what he would consider stable soil, so even if the anchor head had been properly engaged, it would only have been anchored into a small area of soil that could resist any pull. He opined that the six-foot Olshan anchor was not nearly long enough to sufficiently engage stable soil and provide adequate resistance. According to Mr. Vines, they should have been installed twelve to twenty feet beyond the wall. He said that when you don't extend a sufficient length and achieve the required resistance, "these things are useless."

Additionally, Mr. Vines saw no benefit to a warranty pursuant to which wall anchors would be continually adjusted and tightened. He explained that if the anchor had been properly installed in the first place, there would never be a reason to come back and tighten it. If it was properly embedded in stable soil, it would not become loose and move in that manner. Mr. Vines added, "it's almost like they're planning on this thing being not deep enough to really be providing the right kind of tension[.]" He also explained that if an anchor does fail and no longer have tension, tightening a bolt is not going to help anything; instead, the anchor would have to be replaced and properly installed.

In summary, Mr. Vines opined that a wall anchor system could have potentially worked for Ms. Maddox's home, and if the system had been properly designed and installed to an appropriate length to achieve the necessary resistance, the wall would not have moved. However, he believed that Olshan had "taken what appears to be a one-size-fits-all solution and applied it to this house," and without doing any calculations to determine the proper length, "there's no way that this system would've solved anything at this site." He believed the Wall Lock system installed by Olshan "was destined to fail."

Next, Mr. Vines discussed the Water Lock system installed by Olshan. He said, "I'm not seeing how that system installed at this home is benefitting anything." Mr. Vines explained that Olshan installed an interior drain system that did nothing to relieve the water pressure applied to the outside of the foundation wall. Moreover, according to Mr. Vines, the Water Lock system would not have any impact whatsoever on the water coming out from the front of the house under the footer.

Finally, Mr. Vines discussed the Cable Lock pilings installed along the front foundation wall. Again, the Olshan brochure stated, "The installation process involves

individual sections of concrete being driven to depths of up to 90 feet beneath your foundation and locked together by the cable." Mr. Vines opined that Olshan should have required a minimum depth for installation of the pilings in order to ensure that the load was transmitted to a deeper soil strata. The Olshan work log indicated that the pilings were installed to an average depth of only two to three feet. Mr. Vines explained that this was still in the upper soil strata, and if the pilings were installed at that shallow of a depth, it should only have been because they encountered bedrock. He found no indication from the Olshan logs that they encountered bedrock. The logs simply indicated the distances of two to three feet. In sum, Mr. Vines opined that Olshan should have required a minimum depth in the absence of encountering bedrock.

Mr. Vines observed that the home had continued to settle despite the installation of the Cable Lock pilings and adjustments to them. Mr. Vines testified that in his experience working with foundation companies, only about three percent of pilings experience movement over their lifetime and require adjustments. He believed that all of the damage along the front of the house was settling as that term was used in the Olshan warranty.

Based on the information Mr. Vines had reviewed, he believed that when Olshan was hired in 2005, a design certainly could have been engineered to help stabilize the home. Mr. Vines testified that if Olshan had properly designed the anchor system and extended it to provide sufficient resistance, the historic Nashville flood in 2010 would not have caused any movement in the structure. However, because the system was not significantly embedded in stable soil, that event exacerbated the existing issues at the home.[3] In summary, Mr. Vines believed that the home had continued to progressively worsen and move over the past twelve years "as a result of the failure of this system." Mr. Vines testified that "if the system had been properly installed and designed, it should've been able to hold" the structure in place without any ongoing continuing damage. He believed it would be very difficult to stabilize the home at the time of trial.

The only representative of Olshan to testify at trial was Susan Bryan. She and her brothers were partners in a limited partnership she called Olshan of Nashville, and she served as its managing member. This entity was formed in 2000. A separate entity, Olshan Foundation Repair Company of Houston, was the company referenced in the brochure with over 70 years of experience. Ms. Bryan testified that Olshan of Nashville was licensed to use the Olshan trademark and pays another company, owned by her parents, for use of the Olshan name.

---

[3] Although Ms. Maddox sometimes referred to the 2013 date when the trees fell as a "slide," Mr. Vines testified that he found no evidence of escarpment in the soil to indicate an abrupt soil slope failure within her yard. However, he did discover some evidence of escarpment on the adjacent property uphill, indicating some type of global soil failure.

Ms. Bryan lived in Houston and was not responsible for the day-to-day operation of the Nashville entity. She had an undergraduate degree in economics but no engineering training. Ms. Bryan had been working in the foundation repair industry fulltime since 1998, doing sales and marketing at first, then serving as general manager of a separate foundation company. Ms. Bryan had worked with a visual designer and a printer to design the Olshan brochure, and she was responsible for writing its content.

Until this litigation arose, Ms. Bryan was not involved with the Maddox property. She had reviewed the Olshan file on the Maddox property and first visited the home in 2016. Ms. Bryan was asked about the Olshan documents listing Kevin Hayman's title of "Certified Structural Technician." Ms. Bryan testified that she was involved in designing the circular designation of the stamp or seal listing that title. She explained that Olshan gives employees that title after they complete a three-week training course and then take a test provided by BEC Engineering.[4] She said that BEC Engineering "certified" Mr. Hayman, and the entire program takes about three weeks from the time the employee is hired. The employee spends one week in the field with crews observing installations, one week riding with other technicians and preparing repair plans, and one week with managers looking at jobs. Ms. Bryan denied that the circular stamp or seal was intended to suggest some legal significance or professional discipline.

Ms. Bryan conceded that the engineer who provided the letter to Olshan from BEC Engineering did not travel to Tennessee to view the property. In addition, she acknowledged that the Olshan file did not reflect any conversations or communications between the Nashville office and Mr. Farr in Texas. Ms. Bryan said Olshan's "standard procedure" was simply to send its work log and drawing to the engineering firm for review. Olshan's file contained logs regarding the depths of pilings and wall anchors and various pressures, but it did not contain any photographs of the property.

As previously noted, the contract between Olshan and Ms. Maddox stated, "Work permitted to meet local government requirements." However, Ms. Bryan suggested that a permit was not necessary for this type of work. She interpreted the aforementioned provision of the contract to mean that Olshan would pull a permit if it was required.

Ms. Bryan described Olshan's standard practices with regard to the three systems at issue. She acknowledged that none of the systems Olshan installed at the Maddox property were intended to fix a problem with water around a footer. She said, "A footer drain is a very different repair." Ms. Bryan explained that the Olshan Water Lock system was not for exterior drainage, and she did not believe that Kevin Hayman would have

---

[4] Ms. Bryan's father had for some time been part owner of BEC Engineering, and Olshan of Nashville had served as registered agent in Tennessee for BEC Engineering. Ms. Bryan and her brothers also owned the building where BEC Engineering operated in Texas, and BEC Engineering leased space from them.

told Ms. Maddox that this system would have fixed all of her water problems with her foundation.

Regarding the Wall Lock system, Ms. Bryan confirmed that Olshan employees drove in the wall anchors without performing any calculations. She explained that the rod "is driven into the ground until it won't go any further, at an angle, and then pulled back." She testified:

Q. [I]f I'm understanding you correctly, there are no calculations done on the project; it's you go until you can't?
A. You drive it until it won't go any further, yes, ma'am.

She testified that Olshan provided a Wall Lock warranty to retighten the areas if any adjustments were required. She explained that "if the anchor becomes loose, we can retighten it."

Olshan presented expert testimony from Keith Michael Garman, a geotechnical engineer. Mr. Garman had been licensed as an engineer in Tennessee and Florida since 1991. He explained that a geotechnical engineer deals with structural foundations and how they bear on earth materials. Mr. Garman visited the Maddox property in 2013 after the two trees fell on the house.[5] He also reviewed the Olshan file and the report from Mr. Vines.

Mr. Garman believed that the work Olshan performed "had value in stabilizing [the] home" and "was an appropriate repair for the conditions at that time." However, Mr. Garman had reviewed Olshan's logs regarding installation of the pilings for the Cable Lock system, and he acknowledged that all of them were "very shallow," at either two or three feet deep. He believed that such distances would most likely indicate the presence of very shallow bedrock. Mr. Garman conceded that during his 2013 site visit, he observed that one or more pilings at the front left corner of the house "had not performed properly." He observed some shifting and rotation indicating that they had not been set properly and needed replacing or additional work beyond just an adjustment.

Mr. Garman agreed that it was important for earth anchors to reach undisturbed soil, yet he believed that the wall anchors installed by Olshan could be placed without the assistance of an engineer. He testified that the construction of this house was not unusual and actually very typical for the time period, making this "a pretty standard installation." From Olshan's notes, Mr. Garman discerned that the wall anchors extended "a decent

_____

[5] Mr. Garman testified that anytime a house is constructed on a steep slope, concerns arise about potential landslide hazards. However, he saw nothing to suggest any landslide-type movement during his visit to the property in 2013. He saw no leaning trees or fence lines and no scarps or drop-offs. Mr. Garman believed that a wind event probably caused the trees to lean, not sliding soils.

distance." However, one was driven to only 4 feet 9 inches, which Mr. Garman said was "a little concerning as to why it went such a short distance[.]" Still, he suggested that the workers may have hit rock or debris. Mr. Garman believed that "pullback" tests performed by Olshan could determine the strength of the anchors when installed. However, he believed that the 2010 flood was a significant factor in the anchors coming loose. As of the date of his visit to the site in 2013, Mr. Garman believed that the wall anchors needed to be reinstalled because they had been weakened, and once they lost their hold, they were not likely to get it back.

Mr. Garman believed that the 2010 Nashville flood "could've had a significant impact" on the home based on the statement in the 2006 BEC engineering letter that "[s]oils should be graded such that there is positive drainage away from the foundation to prevent water from ponding around the foundation system." (Mr. Garman did not believe it was necessary for the BEC engineer to visit the site to state the conclusions in his letter.) He did not know whether such language was "boilerplate in foundation contracts" but considered grading "an important factor in the stability of any home." He explained that if the ground sloped downward toward the rear foundation wall, it could create a valley between the back wall and the slope so that the house essentially acts as a dam, causing water to pool and infiltrate into the ground. Mr. Garman stated that improper grading can lead to saturated soil, which would significantly weaken the strength of the soil and cause the anchors to lose their strength. He also testified that uncontrolled runoff would put the rear wall in danger of further settlement. According to Mr. Garman, "if you have uncontrolled runoff that saturates the soils in an area that hasn't been stabilized, or in an area where you have soil anchors, you're asking for additional problems." He acknowledged, however, that Olshan took no steps to address any water issues coming from uphill aside from the single sentence in the BEC letter months after the work was complete. Mr. Garman agreed that it would have been reasonable for Olshan to recommend grading before it installed its systems. He also said that grading alone would not have fixed the problems.

The trial court entered a fifteen-page written order, which incorporated an additional fifty-one-page transcript, on February 21, 2018. As previously noted, the trial court found Mr. Vines very knowledgeable and fully credited his testimony. On the other hand, the trial court found "Mr. Garman's expert opinion that the three systems were effective was greatly undercut by the need for soil knowledge and the need for waterproofing that both experts noted."

Regarding the claim for breach of warranty, the trial court found that "[t]he lifetime warranty was for adjustments to be made to the devices for the life of the house[,] which is not much of a lifetime warranty." For reasons that will be discussed in greater detail below, the trial court found that Ms. Maddox's fraud claim was not barred by the statute of limitations or the statute of repose, as argued by Olshan. Regarding the merits of the fraud claim, the trial court found that Ms. Maddox carried her burden of

showing that Olshan made reckless and fraudulent misrepresentations that caused her damages. Specifically, the trial court found that Olshan lacked the knowledge to design an effective solution for Ms. Maddox's house, and it made reckless and material misrepresentations about the permit, the engineer, and the effectiveness of its systems. The court found that by the time Ms. Maddox realized that Olshan had made fraudulent statements to her, it was too late to save her house, and repairs were no longer possible given the extent of the damage. The court found that Ms. Maddox had sufficiently proven "the loss of value" of her home. After discussing the property tax values, the testimony of the real estate broker, and the testimony of Ms. Maddox, the trial court concluded that the property would have had a fair market value of $240,000 if it was in good condition. Next, the trial court found that "[t]he difference between the current value and the value the property would have had if the water solutions had worked is $187,000." The trial court also found that Olshan's conduct was egregious enough to warrant an award of $15,000 in punitive damages. After the resolution of a post-trial motion, Olshan timely filed a notice of appeal.

## II. ISSUES PRESENTED

Olshan presents the following issues, as we perceive them, for review on appeal:

1. Whether the trial court erred in finding that the statute of repose provided in Tennessee Code Annotated section 28-3-202 did not apply to the services performed by Olshan;

2. Whether the trial court erred in finding that the fraud claim was not time-barred by the three year statute of limitations because the claim did not accrue until 2011;

3. Whether the trial court erred by finding that Olshan engaged in fraud;
   a. Whether the trial court erred by finding that Olshan made misrepresentations regarding the permit;
   b. Whether the trial court erred by finding that Olshan made misrepresentations regarding the involvement of an engineer; and
   c. Whether the trial court erred by finding that Olshan misrepresented the effectiveness of its systems;

4. Whether the trial court held Olshan responsible for the negligence or fraud of BEC Engineering;

5. Whether the trial court erred by measuring damages at the time of trial in 2017 as opposed to the time of the transaction in 2005 or when the cause of action accrued in 2011;

6. Whether the trial court erred in awarding punitive damages.

In her posture as appellee, Ms. Maddox raises the following additional issues:

7.      Whether the chancery court erred by not awarding additional damages for the lost benefit of the bargain; and

8.      Whether the chancery court erred by not awarding Ms. Maddox all additional damages.

For the following reasons, we affirm the decision of the chancery court as modified and remand for further proceedings.

### III.   DISCUSSION

### A.    *Statute of Repose*

We begin with Olshan's argument that Ms. Maddox's claim should have been barred by the statute of repose found in Tennessee Code Annotated section 28-3-202, which provides:

> All actions to recover damages for any deficiency in the design, planning, supervision, observation of construction, or construction of an improvement to real property, for injury to property, real or personal, arising out of any such deficiency, or for injury to the person or for wrongful death arising out of any such deficiency, shall be brought against any person performing or furnishing the design, planning, supervision, observation of construction, or construction of such an improvement within four (4) years after substantial completion of such an improvement.

"In enacting the statute, the General Assembly intended to insulate contractors, architects, engineers, and others from liability for defective construction or design of improvements to realty where the injury happens more than four years after substantial completion of the improvement." *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 540 (Tenn. 1998). The statute "will bar an action four years after substantial completion, regardless of when the plaintiff may have reasonably discovered the injury." *Id.* at 539.

This statute of repose applies to "claims involving the construction of some kind of improvement." *Id.* at 538 n.5; *see also Harmon v. Angus R. Jessup Assocs., Inc.*, 619 S.W.2d 522, 523 (Tenn. 1981) (recognizing that the statute prohibits suits against those "engaged in the construction of improvements to real property"). Accordingly, in this context, courts have recognized "a distinction between 'improvements to real property' and 'mere repairs or replacement.'" *Coffman v. Armstrong Int'l, Inc.*, No. E2017-00062-COA-R3-CV, 2019 WL 3287067, at *6 (Tenn. Ct. App. July 22, 2019). Determining

- 19 -

whether the work constituted "construction of an improvement to real property" is an issue of law, which we review de novo. *Memphis Light, Gas & Water Div. v. T.L. James & Co. Inc.*, No. 52, 1986 WL 11588, at \*4 (Tenn. Ct. App. Oct. 17, 1986). This phrase is not defined in the statute, so we must give the words their usual and ordinary meaning. *Id.* at \*3. Looking to the definition from *Black's Law Dictionary*, Tennessee courts have defined an "improvement" for purposes of this statute of repose as:

> [A] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes.

*Id.*

Some examples are helpful. In *Cartwright v. Presley*, No. E2005-02418-COA-R3-CV, 2007 WL 161042, at \*1-2 (Tenn. Ct. App. Jan. 23, 2007), we considered whether the addition of a 3,000-pound walk-in cooler at a florist would constitute the construction of an improvement to real property. The plaintiffs argued that the cooler was only an appliance or trade fixture and not an improvement to real property. *Id.* at \*3. Our research revealed "two widely-employed analytical approaches used in determining whether a particular act of construction constitutes an improvement to real property." *Id.* (citing 63B Am.Jur.2d *Products Liability* § 1631 (1997); 2 Bruner & O'Connor Construction Law § 7:174.53). One approach focused on a common law fixture analysis, and the other was a "common sense approach" looking to the usual definition of the word improvement. *Id.* Under the "common sense approach," the focus was on "whether the addition or betterment to the property increases the property's value, involves the expenditure of labor or money, and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *Id.* (citing 41 Am.Jur.2d *Improvements* § 1 (1995)). We did not find it appropriate to adopt one approach to the exclusion of the other but said that either one or both may serve as a useful analytical tool when classifying the nature of work on real property, depending on the facts of each case. *Id.* at \*4. Considering these approaches and other cases on this issue, we concluded that the assembly and installation of the walk-in cooler was a valuable addition and "improvement" to the real property. *Id.* at \*5. Notably, we found no evidence suggesting that the installation of the cooler was a mere repair or replacement. *Id.*

More recently, this Court considered whether the daily removal and installation of insulation at an industrial facility over the course of many years would constitute the construction of an improvement to real property. *See Coffman*, 2019 WL 3287067, at \*7. We recognized that the *initial* installation of insulation in a building *may* be considered construction of an improvement to real property if it is intended to be a permanent feature, but we nevertheless held that the daily removal and installation of insulation over the course of many years was a mere repair or replacement, and not the "construction of

an improvement to real property" within the meaning of the statute. *Id.*

In the case before us, the trial court found that the damages asserted did not arise out of the construction of "an improvement to real property" within the meaning of the statute. On appeal, Olshan argues that the services it provided at the Maddox property "fall squarely within the types of services that were intended to be addressed by the statute of repose." Olshan claims that it was retained to "ameliorate the deteriorating condition" of the property and increase its value because the home experienced cracking, water intrusion, and tilting.[6]

In our view, however, Olshan's argument only confirms that the services it provided were repairs and not the construction of an improvement to real property. Ms. Maddox contacted Olshan because she was experiencing problems at the home. She needed Olshan to correct or otherwise address bowing walls, cracks in the foundation and walls, and water intrusion. Although these actions, like most repairs, might ultimately improve or better the condition of the property, they were nonetheless repairs to the property, not improvements in the ordinary sense of the word. They were not "intended to enhance its value, beauty or utility or to adapt it for new or further purposes." *Memphis Light, Gas & Water Div.*, 1986 WL 11588, at *4. At trial, Ms. Bryan herself described Olshan as "a remedial repair contractor." The remedial repair work Olshan performed at the home does not fall within the usual and ordinary meaning of "the construction of an improvement to real property." As a result, we affirm the trial court's conclusion that the four-year statute of repose in Tennessee Code Annotated section 28-3-202 did not bar this action.[7]

## B. Statute of Limitations

Next, Olshan argues that the trial court erred in finding that Ms. Maddox's fraud claim was not barred by the three-year statute of limitations. Ms. Maddox filed suit on May 3, 2012. Applying the discovery rule, the trial court found that her cause of action for fraud accrued in August 2011. On appeal, Olshan agrees that the three-year statute of limitations applies and that the discovery rule is applicable to fraud claims. However, Olshan argues that "any claim of fraud related to [its] work accrued in 2006 when [Ms.

---

[6] "To 'ameliorate' something means to 'make [it] better.'" *Cartwright*, 2007 WL 161042, at *5 (quoting *Black's Law Dictionary* 80 (7th ed. 1999)).

[7] This statute of repose contains a "fraud exception" found at Tennessee Code Annotated section 28-3-205. *Chrisman*, 978 S.W.2d at 541. It prevents application of the statute of repose if the defendant was "guilty of fraud in performing or furnishing the design, planning, supervision, observation of construction, construction of, or land surveying, in connection with such an improvement" or if the defendant "wrongfully conceal[ed] any such cause of action." Tenn. Code Ann. § 28-3-205(b). The trial court did not reach the applicability of this exception because it found the statute of repose inapplicable. We agree with the trial court's analysis and do not reach the alternative arguments presented by the parties regarding the fraud exception.

Maddox] was placed on inquiry notice of her potential fraud claim." Olshan argues that Ms. Maddox was aware in 2006 that the home was not stabilized the way she expected it would be because Olshan made the first adjustment at that time, and she sensed the tilting and noticed additional cracks.[8] Olshan argues that Ms. Maddox could not delay filing suit until all the consequences of the alleged wrong were actually known.

The discovery rule was adopted as an "equitable exception" to the statute of limitations due to the unfairness of requiring a plaintiff to sue to vindicate a non-existent wrong at a time when the injury was unknown and unknowable. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 710 (Tenn. 2019). "Under the discovery rule, the statute of limitations will only begin to run when the plaintiff has actual knowledge of the claim, or when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that she has suffered an injury as a result of wrongful conduct." *Coffey v. Coffey*, No. E2017-00988-COA-R3-CV, 2018 WL 4519988, at *7 (Tenn. Ct. App. Sept. 20, 2018) *perm. app. denied* (Tenn. Feb. 20, 2019). The discovery rule is not intended to allow a plaintiff to delay filing suit until he or she discovers all the facts affecting the merits of his or her claim. *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012). Thus, the limitations period begins to run when the plaintiff "gains information sufficient to alert a reasonable person of the need to investigate the injury." *Id.* (quotation omitted).

"'The issue of accrual of a cause of action is basically a question of fact,'" meaning that this Court will review the trial court's determination de novo with a presumption of correctness and will not overturn the trial court's decision unless the evidence preponderates against it. *Langford v. Clark*, No. M2011-01910-COA-R3-CV, 2012 WL 3608662, at *5 (Tenn. Ct. App. Aug. 22, 2012) (quoting *Johnson v. Craycraft*, 914 S.W.2d 506, 511-12 (Tenn. Ct. App. 1995)). More particularly, for purposes of the discovery rule, "whether a plaintiff exercised reasonable care and diligence in discovering her injury is usually a fact question for the trier of fact to determine." *Coffey*, 2018 WL 4519988, at *7 (citing *Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 854 (Tenn. 1995)).

In reaching its decision in this case, the trial court discussed the terms of the lifetime warranty and noted that Olshan made such adjustments to its systems in 2006, 2007, 2010, and 2011. The trial court found that Olshan advised Ms. Maddox that nothing else could be done in August 2011. The trial court found that Ms. Maddox did not know that the house was not fixable until this point, and, the trial court added, "[t]his was reasonable." The trial court noted that Ms. Maddox was not a sophisticated party and that she had continued to invest money in her home throughout this time period. The

---

[8] Notably, Olshan insists that the fraud claim accrued in 2006, and it does not argue that Olshan's return visits to the home after the flood in 2010 put Ms. Maddox on notice of her injury, as these events occurred within three years of the filing of the complaint in 2012.

trial court found that the engineering letter provided by Olshan caused Ms. Maddox to have confidence in the Olshan systems as the solution to her problems, and it was not until August 2011 that she realized that Olshan would not return and would not otherwise provide a permanent solution for the house. The court found that Ms. Maddox did not have a reason to believe that Olshan would not continue to help her or would not honor its lifetime warranty until August 2011.

The evidence supports the trial court's conclusions. In 2006, Olshan made an adjustment to the systems on one occasion on its own initiative. Ms. Maddox had admittedly sensed the tilting and observed some progression in the cracks. However, the adjustment fixed the tilt in the home for the time being. The warranties provided by Olshan conveyed to the purchaser that further adjustments might be necessary in the event of future settlement. The certificate for the Cable Lock Lifetime Foundation Warranty stated that if any "adjustments" were required during the life of the home "due to settling," Olshan would re-raise or adjust all areas previously "underpinned" without cost to the owner. Consequently, we cannot say that the events occurring in 2006 were sufficient to put a reasonable person on notice that she had suffered an injury as a result of Olshan's wrongful conduct, and we reject Olshan's argument that the fraud claim accrued in 2006.

## C.    *Fraud*

The next issue raised by Olshan is whether the trial court erred in finding that it engaged in fraud. Because "'fraud assumes many shapes, disguises and subterfuges,'" any effort to precisely define fraudulent conduct would be futile. *Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012) (quoting *Waller v. Hodges*, 321 S.W.2d 265, 271 (Tenn. Ct. App. 1958)). According to our supreme court,

> The ancient common-law action for deceit provided the vehicle for persons to seek recovery from those who intend to deceive others for their own benefit. W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 105, at 727-28 (5th ed.1984) ("Prosser & Keeton"). The basis for finding legal responsibility for deceit centered on the defendant's intent to deceive, mislead, or convey a false impression. Prosser & Keeton, § 107, at 741.
>
> Throughout the centuries, the courts have had little difficulty finding the required intent to deceive when the evidence shows either that the defendant knows the statement is false or that the defendant made the statement "without any belief as to its truth, or with reckless disregard whether it be true or false." Prosser & Keeton, § 107, at 741-42. . . . .

*Id.*

- 23 -

To recover for fraud (also known as fraudulent or intentional misrepresentation):

a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation.

*Hodge*, 382 S.W.3d at 343.

"Fraud claims are inherently fact-intensive[.]" *Vic Davis Constr., Inc. v. Lauren Engineers & Constructors, Inc.*, No. E2017-00844-COA-R3-CV, 2019 WL 1300935, at *6 (Tenn. Ct. App. Mar. 20, 2019). "Whether a defendant had the present intent to defraud another is a question of fact." *Ray v. Williams*, No. W2000-03000-COA-R3-CV, 2002 WL 974671, at *3 (Tenn. Ct. App. May 9, 2002) (citing *Keith v. Murfreesboro Livestock Mkt., Inc.*, 780 S.W.2d 751, 754 (Tenn. Ct. App. 1989)). Likewise, "the truthfulness or falsity of a statement is a question of fact[.]" *Morrison v. Allen*, 338 S.W.3d 417, 428 (Tenn. 2011). As previously noted, in this case, the trial court found that Olshan made reckless and material misrepresentations "about the permit, the engineer and [the] effectiveness of Olshan's systems." On appeal, Olshan challenges these findings but on a rather limited basis. Olshan does not analyze all of the aforementioned elements of a fraud claim. Instead, it argues that it "did not make any false misrepresentations" regarding the three subjects mentioned by the trial court. We address each argument in turn.

### 1. The Permit

Olshan's written contract with Ms. Maddox stated, "Work permitted to meet local government requirements." The trial court found that Olshan did not in fact apply for a permit because it did not believe that permits are required for foundation repairs. The trial court's order discusses the testimony of Mr. Hall, who explained that city ordinances do require a permit for the type of repairs Olshan performed. During her oral ruling, the trial judge explained that even though the definition of "normal maintenance repairs" did use the term "underpinning," it only excepted "minor repairs to . . . underpinning[.]" Thus, the trial court concluded that a permit was required, Olshan failed to obtain one, and Olshan "had no intention of getting one contrary to the contract term about permits which were misleading."

Olshan argues on appeal that "the Trial Court erred in holding that a building

- 24 -

permit was required for Olshan's services." Olshan claims that the trial court impermissibly deferred to the code interpretation espoused by Mr. Hall and should have conducted an independent review of the code sections. Olshan maintains that its work would fall within the exception for "normal maintenance repairs" because it used the term underpinning. "At the very least," Olshan argues, "the lack of clarity on whether a permit was required shows that Olshan did not act with the requisite intent to establish fraud as it relates to its failure to obtain a permit."

This argument misses the point. Olshan's contract unequivocally stated, "Work permitted to meet local government requirements." This conveys the message that Olshan had obtained a permit in order "to meet" local government requirements. Simply put, the contract did not say or suggest that no permit was required or that Olshan would apply for a permit if one was required. Regardless of whether city ordinances required a permit, Olshan represented to Ms. Maddox that the work was "permitted to meet local government requirements." This was not true, and Olshan knew it. The evidence supports the trial court's finding that Olshan failed to obtain a permit and "had no intention of getting one contrary to the contract term about permits[.]" We reject Olshan's argument that its statement was not false or that it did not make the statement with the requisite intent.

## 2. The Engineer

Next, Olshan argues that it did not misrepresent the involvement of the engineer, and without a misrepresentation, the fraud claim must fail. Olshan points to the contractual language stating that it would "furnish BEC engineering letter after work is completed." Olshan notes that "the BEC Letter was, in fact, provided after the work was complete." Olshan contends that Ms. Maddox knew from the contract that the engineer would be involved on the back-end of the project. As such, Olshan argues that there was no misrepresentation.

The trial court did not view Olshan's conduct so narrowly. The trial court found that Kevin Hayman told Ms. Maddox that an engineer would be involved with the solution. It also found that Ms. Maddox paid over $23,000 for the three systems believing that they had been engineered and would work for her home. Olshan's brochure described the "[e]ngineered Cable Lock" system, stating that "[c]ity inspectors, engineers, and you personally can verify job performance." The contract stated that Olshan would furnish Ms. Maddox with a BEC engineering letter once the work was complete, and Olshan gave the letter to her in March 2006. The letter stated that the engineer had "reviewed the subject foundation repairs that were made to the above referenced residence." It said that Olshan "presented the repaired portion of the foundation . . . at the above referenced location for BEC's review," and the "repairs were found to be in general compliance with industry standards[.]" The attached drawing with the engineer's seal had a handwritten notation beside it stating, "Recommendations are

- 25 -

based on limited visual survey."

The trial court found that the engineer did not visit the house or see the actual work that was done, nor did he perform calculations. The court "credit[ed] the low opinion Mr. Hall ha[d] of the BEC Engineering letter." The trial court found that the letter was fraudulent and misleading because it expressly stated that a limited visual survey was performed when in fact it was not. The court found that "Olshan was well aware the engineer it used was never present on the property." The trial court found that "[t]he engineer's statement was not truthful, and it misled [Ms. Maddox] into believing that the systems and the installation were engineered professionally." It found that the letter caused Ms. Maddox to have confidence in the Olshan systems as the solution to her problems, and it was not until August 2011 that she realized that they would not provide a permanent solution for the house. In summary, the trial court found that "the BEC letter . . . was designed to conceal from [Ms. Maddox] that the installation of the systems was not engineered, as was required for the systems to be effective."

We discern no error in these findings and agree with the trial court's conclusion that Olshan made material and fraudulent misrepresentations about the involvement of the engineer. There is no merit to Olshan's argument that it made no misrepresentations.

### C.    The Effectiveness of Olshan's Systems

Finally, we consider the trial court's finding that Olshan made reckless misrepresentations regarding the effectiveness of its systems. The trial court found that Mr. Hayman explained to Ms. Maddox that the three Olshan systems would work together to stabilize her house from further movement. The trial court noted that Olshan's documents reflected Mr. Hayman's name with "a seal-like image" describing him as a certified structural technician, when in reality, he was "certified" after a three-week class at BEC Engineering. The trial court recited many of the statements provided in the Olshan brochure (and quoted at length earlier in this opinion). For example, the brochure stated that the advantage of its Wall Lock anchor system was that it "[r]eaches virgin soil." The trial court found that the type of lifetime warranties provided by Olshan also gave context to the claim for fraudulent misrepresentation.

The trial court credited the opinion of Mr. Vines that the wall anchors installed by Olshan "were not effective and provide[d] no benefit" because they did not penetrate into good soil where the anchors could hold. The court found that Olshan performed no engineering soil studies, and without knowledge of the soil, the anchors simply could not be placed effectively. The court also found that the Water Lock system "does nothing to relieve the water pressure on the outside of the house" and provided no benefit to the property given its problems. Because Olshan did not solve the water problem coming from the slope behind the property, the court found, "the house was destined to continue to move, and the Olshan solution was destined to fail." The trial court found that Olshan

used "a one-size-fits-all solution," and "the systems were not a solution for this property."

The trial court found that Ms. Maddox had no expertise in building or water problems, and her belief that a Tennessee engineer was involved made her rely even more on Olshan's expertise. The court concluded that the engineering letter Olshan provided "was designed to conceal from [Ms. Maddox] that the installation of the systems was not engineered, as was required for the systems to be effective." Ultimately, the court concluded that "Olshan does not have an understanding and knowledge to design an effective solution for [Ms. Maddox's] house." It found that if Olshan had not concealed the true condition of the property, Ms. Maddox would not have bought the Olshan systems and would have instead waterproofed her house as the experts at trial agreed was necessary. The trial court found that Olshan's misrepresentations about the effectiveness of its systems were material, and Ms. Maddox had every reason to rely on them.

Again, Olshan's argument on appeal with respect to this issue is rather limited. Olshan insists that the record "does not establish that Olshan had any knowledge that its proposed repair plan would be ineffective" for the Maddox property. According to Olshan, Ms. Maddox had the burden of proving that when Olshan proposed the repair plan, "Olshan *knew* that it would not effectively remedy the problems at the Property." (emphasis added) As factual support for this argument, Olshan notes that Ms. Maddox's expert, Mr. Vines, testified that an earth anchor system could have been used to stabilize the home if it had been designed and installed correctly. As a result, Olshan argues that it recommended an appropriate repair plan even if it ultimately proved to be unsuccessful. Olshan argues that the trial court essentially converted a negligence claim into a claim for fraud.

Even though Olshan insists that it did not have knowledge that its systems would be ineffective, a fraud claim may be established if "the defendant either knew that the representation was false or did not believe it to be true *or* [] the defendant made the representation recklessly without knowing whether it was true or false[.]" *Hodge*, 382 S.W.3d at 343 (emphasis added). Here, the trial court found that Olshan engaged in "reckless misrepresentations." During her oral ruling, the trial judge stated,

> The plaintiff also states that Olshan sold her a solution which did not work, and that Olshan made representations to her about the quality of the solution and the effectiveness of the solution that Olshan knew it did not know, that is, it made statements that this will solve the problem, and Olshan did not know, did not have the expertise, and in fact, did not as a matter of fact know whether the systems would be effective in any way or be completely ineffective. And, basically, Olshan, in selling the systems to the plaintiff, simply did not really care. And that really is the definition of -

or meets the definition of fraudulent misrepresentation because recklessness is defined as when statements are made as fact when the speaker does not know whether they are true or not.

. . . .

So I have found that the elements of fraudulent misrepresentation, that is, in this case, reckless misrepresentation have been met.

The record supports the trial court's conclusion that Olshan and Mr. Hayman made its representations regarding the effectiveness of the Olshan systems recklessly without knowing whether the statements were true or false. This was not an instance of Olshan making an appropriate proposal but simply installing it negligently. The evidence supports the trial court's finding that Olshan "[did] not have an understanding and knowledge to design an effective solution for [Ms. Maddox's] house."

### D.    BEC Engineering

Olshan's next issue is whether the trial court erred "by holding Olshan responsible for the negligence and/or fraud of BEC." The trial court entered a default judgment against BEC Engineering after it failed to appear or defend, and the court reserved the issue of damages. After trial, however, the trial court dismissed the claims against BEC Engineering, finding that it was not so connected to the events at issue that it was responsible for Ms. Maddox's damages.

On appeal, Olshan complains that the trial court's order focused in large part on the conduct of BEC Engineering. Olshan argues that the trial court's criticism of BEC should have had "no bearing" on the claims against Olshan. Olshan contends that it had no control over BEC Engineering or the content of the BEC Engineering letter, and it argues that the trial court essentially attributed the negligence or fraud of BEC Engineering to Olshan.

Olshan cites no legal authority for its argument on appeal, and we find no support for its assertion that the trial court impermissibly "attributed" the negligence or fraud of BEC to Olshan. The trial court specifically found that Ms. Maddox did not show that BEC Engineering was an alias for Olshan. At the same time, however, the trial court found that "BEC was a significant part of the service that Olshan provided to [Ms. Maddox]." We agree with this conclusion. Olshan was the entity that contracted with Ms. Maddox and agreed to provide her with the engineering letter. Even if Olshan did not initially control what the engineer wrote in the letter, Olshan is the entity that provided that information to Ms. Maddox, knowing that it contained false information and knowing that she would rely on it. This issue is meritless.

### E.    Compensatory Damages

Olshan's next issue is "[w]hether the Trial Court erred by measuring damages at the time of trial in 2017 as opposed to at the time of the transaction in 2005 or even at the time of the injury in 2011." Although arguably not encompassed by this issue, as framed, Olshan raises a host of arguments regarding the damage award.

First, Olshan argues that its conduct was not the cause of the complete demise of Ms. Maddox's home. Olshan contends that the loss of Ms. Maddox's home was caused by catastrophic events -- the historic Nashville flood in 2010 and the storm of April 2013, when the trees fell. However, this argument ignores the testimony of Mr. Vines, Ms. Maddox's expert, whose testimony the trial court fully credited. Mr. Vines opined that at the point when Olshan was hired in 2005, a design certainly could have been engineered to help stabilize the home. He testified that if Olshan had properly designed the anchor system and adequately extended it into the soil to provide sufficient resistance, the flood in 2010 "would not have caused any movement in the structure." However, because the system was not significantly embedded in stable soil, he said, that event exacerbated the issues at the home. The following exchange occurred during his testimony:

> Q.   Mr. Vines, in 2005, if they had – if they being Olshan – had engineered and done the work correctly on the front end, would you have seen any damage, or would it have held to the best [of] your knowledge?
> A.   It – it should've performed. It should've held the structure in place and not – not seen any ongoing continuing damage. If – if the system had been properly installed and designed, it should've been able to hold.

Mr. Vines said that the home had continued to progressively worsen and move "as a result of the failure of this system." Based on this testimony, we reject the notion that the loss of the home was caused by storms rather than Olshan.[9]

Next, Olshan argues that Ms. Maddox's own conduct contributed to her home being susceptible to the damage incurred. Specifically, Olshan contends that Ms. Maddox failed to take the action recommended in the BEC Engineering letter, which stated,

---

[9] Olshan argues that if "two distinct, successive causes, unrelated in their operation, conjoin to produce a given injury, one of them must be the proximate, and the other the remote, cause of the injury, and the court, in passing on the facts as found or admitted to exist, must regard the proximate as the efficient and the consequent cause, and disregard the remote cause." *Ward v. Univ. of S.*, 209 Tenn. 412, 423-24 (1962). However, in our view, the work performed by Olshan and the storms that occurred in 2010 and 2013 "cannot be said to be 'unrelated in operation' so as to make the [first] act merely a condition and not a direct and proximate cause." *Kroger Co. v. Giem*, 215 Tenn. 459, 471 (1964). The very purpose of hiring Olshan was to stabilize the structure and address the water intrusion at the home.

> The future performance of the foundation system on the subject location should be as intended. Repairs to concrete and masonry surfaces should be made as soon as possible to help prevent moisture and insect intrusion. *Soils should be graded such that there is positive drainage away from the foundation to prevent water from ponding around the foundation system.*

(emphasis added). Olshan suggests that Ms. Maddox should have graded the back of the property to prevent runoff, and her failure to do so "allowed her home to fall victim" to the later damage.

We disagree. At the outset, we note that the BEC letter is addressed to Olshan, not Ms. Maddox. Olshan provided this letter to Ms. Maddox months after it installed the three systems at her home, including the wall anchors along the back wall. Ms. Maddox testified that when she read the final two sentences above, she thought that Olshan had already addressed those topics. She believed that the grading issue was addressed by the Water Lock system. She testified that "no one ever said I needed to do anything." Ms. Maddox suggested that it would have been very difficult if not impossible to even bring grading equipment into the area behind her house.

We also note that the engineer who wrote this recommendation never visited the site, saw photographs of the property, or discussed the property with Olshan employees. The testimony of Ms. Bryan seems to suggest that these final two sentences were almost standard language in the engineering letters. She said that Olshan pours concrete to cover the access holes it creates, but it does not repair floors or siding, so the first sentence says that those repairs will need to be made. She clarified that this was a cosmetic issue and would not impact the effectiveness of Olshan's systems. When asked about the second sentence regarding grading, Ms. Bryan said that homeowner maintenance and water management are generally considered to be the responsibility of the homeowner rather than Olshan. She suggested that the second sentence might have been intended to ensure that water coming off rooflines, gutters, or downspouts did not flow in and around the foundation.

No one from Olshan ever mentioned grading or even discussed the soil with Ms. Maddox, and Olshan did not condition the effectiveness of its systems on Ms. Maddox hiring someone else to do grading at the property after it installed its systems. We cannot say that this single sentence in the engineering letter is a basis for denying relief to Ms. Maddox in this case.

Olshan next argues that Ms. Maddox failed to mitigate her damages. Olshan points to the fact that engineer Larry McClanahan advised Ms. Maddox in late 2011 that there was an immediate need to stabilize her home. Because Ms. Maddox failed to do so, Olshan argues that she failed to mitigate her damages, and she is not entitled to any recovery.

- 30 -

One who is injured by the wrongful conduct of another, whether by tort or breach of contract, must exercise reasonable care and diligence to avoid loss or minimize damages. *Memphis Light, Gas & Water Div. v. Starkey*, 244 S.W.3d 344, 353 (Tenn. Ct. App. 2007). "'With respect to the burden of proof in such cases, the general rule is that the defendant has the *onus* of establishing matters asserted by him in mitigation or reduction of the amount of plaintiff's damages.'" *Hailey v. Cunningham*, 654 S.W.2d 392, 396 (Tenn. 1983) (quoting *Int'l Correspondence School, Inc. v. Crabtree*, 34 S.W.2d 447, 449 (Tenn. 1931)). "The applicable standard is one of reasonable care. The plaintiff is not required to mitigate his damages if such action is unduly burdensome or impossible." *Haynes v. Cumberland Builders, Inc*., 546 S.W.2d 228, 234 (Tenn. Ct. App. 1976). The injured party is not required to exert "extraordinary efforts." *Carolyn B. Beasley Cotton Co. v. Ralph*, 59 S.W.3d 110, 115 (Tenn. Ct. App. 2000). "The key factor in determining whether a plaintiff has fulfilled his or her duty to mitigate 'is whether the method he [or she] employed to avoid consequential injury was reasonable under the circumstances existing at the time.'" *Kirby v. Memphis Light Gas & Water*, No. W2017-02390-COA-R3-CV, 2019 WL 1895862, at *4 (Tenn. Ct. App. Apr. 29, 2019) (quoting *Kline v. Benefiel*, No. W1999-00918-COA-R3-CV, 2001 WL 25750, at *7 (Tenn. Ct. App. Jan. 9, 2001)).

An examination of the circumstances surrounding Mr. McClanahan's recommendation leads us to conclude that Ms. Maddox acted reasonably. During Olshan's last visit to the home in August 2011, its employee told Ms. Maddox, "Cannot fix. Call office." Ms. Maddox tried repeatedly to contact Olshan, but her calls were not returned. By late 2011, she became very concerned and consulted an engineer, Mr. McClanahan. He provided her with a letter stating that there was an immediate need to stabilize the structure before proceeding with a thorough investigation of the conditions. From her conversations with Mr. McClanahan, Ms. Maddox understood that the home was in critical shape, but she did not get the impression that the house was going to fall the next day. Ms. Maddox mentioned that Mr. McClanahan proposed some sort of recommendation for proceeding, but she said that it was going to cost her over $30,000, and she simply could not afford the cost because she was paying for care for her ill mother at that time and did not have the funds available. Ms. Maddox consulted with other engineers and continued to call Olshan for help, but Olshan did not respond. She filed suit in May 2012. These facts indicate that Ms. Maddox acted with reasonable care by independently investigating the damage to her home, consulting with more than one engineer, repeatedly calling Olshan for assistance, and finally, filing suit. Paying Mr. McClanahan an additional $30,000 would have been unduly burdensome for Ms. Maddox. She did not breach her duty to mitigate damages.

The next issue raised by Olshan concerns the measure of damages utilized by the trial court. Olshan argues that the trial court should have used the "benefit of the bargain" rule applicable to fraud cases rather than the cost to repair versus diminution in

- 31 -

value analysis typically employed in cases involving damage to real property.

This Court considered the same dilemma in *Flatford v. Williams*, No. C.A. 1201, 1989 WL 4419, at *1 (Tenn. Ct. App. Jan. 24, 1989), a case involving fraudulent misrepresentations about a home sold with existing fire damage. The appellants argued that the case should be viewed as one involving injury to real estate, with the measure of damages being either the diminution in value or the cost to repair. *Id.* The appellees argued that the proper measure of damages was the one applicable to a claim for fraudulent misrepresentation. *Id.* We agreed with the appellees and applied the measure of damages for a fraud claim. *Id.* We relied on the Tennessee Supreme Court's decision in *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d at 228, 233 (Tenn. Ct. App. 1976), a case involving fraudulent misrepresentation in a land sales transaction, in which the supreme court also utilized the measure of damages for a fraud claim. *Id.* Based on these cases, we agree with Olshan that the trial court should have applied the measure of damages applicable to fraud claims.

Next, Olshan argues that the trial court was limited to using the benefit of the bargain rule, valued at the time of the contract, as the *only* measure of damages for a fraud claim. In *Haynes* (and *Flatford*), those courts explained that the proper measure of damages was the benefit of the bargain rule. Thus, Olshan argues on appeal that the trial court should have used that measure also. However, after *Haynes* was decided in 1976, the Tennessee Supreme Court adopted the Restatement (Second) of Torts as setting forth "the proper measure of damages for fraudulent misrepresentation." *Boling v. Tenn. State Bank*, 890 S.W.2d 32, 35 (Tenn. 1994). The Tennessee Supreme Court reaffirmed the applicability of this measure of damages in 2012, stating:

> Adopting the Restatement (Second) of Torts § 549 (1977), this Court has held that the proper measure of damages for an intentional misrepresentation claim is:
>
> (1) The recipient of [an intentional] misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what he has received in [the] transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.
> (2) The recipient of [an intentional] misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

*Hodge*, 382 S.W.3d at 343 (quoting *Boling*, 890 S.W.2d at 35-36).

The Comments to this Restatement section explain that "[l]oss may result from a recipient's reliance upon a fraudulent misrepresentation in a business transaction in one of several ways." Restatement (Second) of Torts § 549 (1977) cmt. *a.* The most common is when the falsity of a representation causes *the article purchased* to be of less value than that which it would have had if the truth was known, and clause (1)(a) of the Restatement provides for the recovery of general damages so resulting. *Id.* Recognizing that losses may be sustained in other ways, clause (1)(b) further provides for the recovery of special or consequential damages. *Id.* Both of these options for recovering pecuniary loss are found in subsection (1). The comments further explain:

> *g.* Subsection (1) states the rules normally applicable to determine the measure of damages recoverable for a fraudulent misrepresentation in a tort action of deceit. If the plaintiff is content with these damages, he can always recover them. The rules stated in Subsection (1) are the logical rules for a tort action, since the purpose of a tort action is to compensate for loss sustained and to restore the plaintiff to his former position, and not to give him the benefit of any contract he has made with the defendant. When the plaintiff has not entered into any transaction with the defendant but has suffered his pecuniary loss through reliance upon the misrepresentation in dealing with a third person, these are the rules that must of necessity be applied.

> When the plaintiff has made a bargain with the defendant, however, situations arise in which the rules stated in Subsection (1), and particularly that stated in Clause (a) of that Subsection, do not afford compensation that is just and satisfactory. . . . .

> The frequency of these situations has led the great majority of the American courts to adopt a broad general rule giving the plaintiff, in an action of deceit, the benefit of his bargain with the defendant in all cases, and making that the normal measure of recovery in actions of deceit.

> The rule adopted in Subsection (2) does not take this position. One reason is that in occasional cases the out-of-pocket measure of damages will actually be more profitable and satisfactory from the point of view of the plaintiff than the benefit-of-the-bargain rule. . . . Another and a more important, reason is that there are many cases in which the value that the plaintiff would have received if the bargain made with him had been performed cannot be proved with any satisfactory degree of certainty, because it must necessarily turn upon the estimated value of something non-existent and never in fact received. In this case the benefit-of-the-bargain harm to the plaintiff becomes mere speculation, and ordinary rules

of the law of damages preclude the award.

> *h.* This Section therefore follows a compromise position adopted by some jurisdictions, giving the plaintiff the option of either the out-of-pocket or the benefit-of-the-bargain rule in any case in which the latter measure can be established by proof in accordance with the usual rules of certainty in damages. . . . .

*Id.* at cmt. *g-h.*

Utilizing the measure of damages described in the Restatement, then, the trial court could have awarded Ms. Maddox her pecuniary losses (including general and special damages) as set forth in subsection (1), or benefit of the bargain damages under subsection (2). *See* cmt. *h* (explaining that the plaintiff has the option of either the out-of-pocket rule or the benefit-of-the-bargain rule). Although the trial court did not describe its damage award as such, it essentially awarded Ms. Maddox the pecuniary loss she suffered from the loss of her home.[10] The trial court found that it was "too late to save her house," as it was "sliding off the hill" at the time of trial, with cracks over two inches wide, and it had been condemned by the codes department and recommended for demolition. In effect, the trial court awarded damages to Ms. Maddox to compensate her for her pecuniary loss. *See Black's Law Dictionary* (11th ed. 2019) (defining pecuniary loss as "loss of money or of something having monetary value").

It was appropriate for the trial court to award Ms. Maddox her pecuniary loss from the loss of her home, as the Restatement specifically provides that the plaintiff may recover for "pecuniary loss to him of which the misrepresentation is a legal cause." Restatement (Second) of Torts § 549(1). A similar loss was considered in *Ward v. Perna*, 870 N.E.2d 94, 96-97 (Mass. App. Ct. 2007), in which tenants made substantial improvements to a cottage based on assurances that they would be given the opportunity to buy the underlying land. After affirming the jury's finding of fraud, the appellate court was tasked with determining the amount of damages pursuant to the Restatement (Second) of Torts § 549 (1977). *Id.* at 101. In determining the tenants' pecuniary loss, the appellate court agreed with the tenants' contention that their "actual loss [was] not just the cost of the improvements, but the loss of the value of the entire house, as they are now unable to move it as a result of reliance on the misrepresentation and are forced to abandon it." *Id.* at 101-102. The appellate court found that the tenants were entitled to $120,000 in damages for the value of the home lost, based on expert testimony of "its

---

[10] Although the trial court's order discussed the diminution in value versus cost to repair measure of damages, and made its findings in the context of that approach, its analysis of the issue of damages is still helpful to our analysis on appeal. *See, e.g.*, *In re Heinz*, No. 10-52964, 2012 WL 137563, at *12 n.3 (Bankr. E.D. Tenn. Jan. 18, 2012) (discussing the measure of damages for breach of a construction contract and the measure of damages caused by fraudulent misrepresentation and concluding that "both measurements lead to the same result when applied to the facts of the instant case").

condition as of the time of trial." *Id.* at 102 n.12.

Returning to the present case, the remaining issue is the appropriate value of Ms. Maddox's pecuniary loss, as both parties raise arguments on appeal challenging the trial court's calculation of the damage award. Still assuming that the benefit of the bargain rule must apply, Olshan argues that the trial court should not have determined the lost value of Ms. Maddox's property as of the date of trial in 2017. It argues that the trial court should have measured Ms. Maddox's damages as of the date of the contract in 2005 or when Ms. Maddox discovered her injury in 2011. In the event that we do not agree with the trial court's valuation as of 2017, Ms. Maddox argues that the loss should have been measured as of 2011 but not 2005.

Because the trial court was valuing Ms. Maddox's pecuniary loss, rather than the benefit of the bargain,[11] we reject Olshan's contention that the trial court was required to confine its damage award to the date of the contract in 2005. At that point, the resulting damage to the structure, and the pecuniary loss, had not yet occurred. The damage in this case was not completed at the time of the transaction. It progressed slowly over the next several years, as the condition of the house deteriorated. Ms. Maddox was not limited to recovering only the pecuniary loss she had incurred at the time of the representation. *See, e.g., Hodge*, 382 S.W.3d at 348 (explaining that a victim of intentional misrepresentation regarding paternity was "entitled to recover the pecuniary loss he suffered as a result of his justifiable reliance," and the trial court could determine his pecuniary loss by considering the amount of child support, medical expenses, and insurance premiums he paid in the years thereafter). We also reject the suggestion that the calculation of pecuniary losses must end in 2011 when Ms. Maddox learned that Olshan would not return to fix the home. We have already concluded that Ms. Maddox did not fail to mitigate her damages.

The Restatement comments specifically recognize that pecuniary loss may occur depending on the particular use to which the plaintiff puts the article. Restatement (Second) of Torts § 549 cmt. *a.* For instance, loss may occur "when a buyer, in reliance upon the misrepresentation, uses the subject matter of the sale in the belief that it is appropriate for a use for which it is harmfully inappropriate[.]" *Id.* Stated differently, "loss may result from a purchaser's use of the article for a purpose for which it would be appropriate if the representation were true but for which it is in fact harmfully inappropriate."[12] *Id.* at cmt. *d.* In that situation, the resulting damage is recoverable if

---

[11] *See Haynes*, 546 S.W.2d at 233 (explaining that for the benefit of the bargain rule, "[t]he measure of damages and the fixing of the value of the property are to be determined as of the time of the transaction").

[12] Comment *d* to the Restatement provides the following illustration:

> The A Automobile Company puts upon the market cars in part made by itself, in part consisting of parts bought elsewhere and assembled in the cars. B sells to the A

the misrepresentation was a legal cause of it, meaning, "of a kind that might reasonably be expected to result from reliance upon the misrepresentation." *Id.*

Based on Olshan's misrepresentations, Ms. Maddox relied on the subject matter of this sale, the three Olshan systems, to stabilize her home and prevent further structural damage, when in fact the Olshan systems were not effective for that use. This led to further structural damage and the eventual demise of Ms. Maddox's home, causing her pecuniary loss. The full extent of the damage to Ms. Maddox's home was realized in 2017 when the home was finally recommended for demolition. Ms. Maddox testified that she is now unable to sell the property or utilize it for any purpose. Ms. Maddox believed that the home had zero value.

Ms. Maddox entered her property tax records for each year into evidence at trial. According to those records, her home was appraised, for tax purposes, as high as $203,700 for 2009 and 2010. However, it substantially decreased thereafter, and the total assessed value for 2017 was only $13,400, with $11,400 of that amount being attributable to the land, and only $2,000 being attributed to the structure. Ms. Maddox testified about sales of several comparable homes on her street and in her neighborhood over the past few years. She determined the price per square foot for these sales, then estimated that when the trees fell on her home in 2013, the home would have been worth about $230,000, conservatively, if it had been in good condition. She also presented the testimony of Mr. Courtney, the real estate broker with nearly 40 years of experience. He had visited Ms. Maddox's property at least twice, including on the morning of his testimony, although he had not been inside the house because it had been condemned. He opined that if the house had been "in perfect condition," it would have been valued at around $152 per square foot. Two homes on the same street were sold in the current calendar year, one for $152 per square foot and another for $132 per square foot. Using these numbers, he estimated that the Maddox home would have been worth $234,000 to $254,000 if in good condition. He believed that rebuilding on the lot would be cost prohibitive.

The trial court's actual calculations of value are a bit confusing. First, in discussing the property tax values, the court correctly stated that the value had risen as high as $203,700. However, the court stated that the values decreased after that year, and "[i]n 2017, the building value was $42,000, and the land value by the tax assessor for tax purposes was noted at $11,400." From our review of the record, this information is incorrect. The 2017 value of the structure was only $2,000, not $42,000. The land value

Company a quantity of roller bearings by misrepresenting them to be X roller bearings. The X bearings are standard and high class bearings. The bearings sold are in fact inferior and not made by the X Company. After these bearings have been assembled in a number of the cars their true character is discovered and the cars are sold at a lesser price because the bearings are not the X bearings. The A Company is entitled to recover the depreciation in the sales value of its cars because of the inferior bearings.

was $11,400, for a total value of $13,400.

Next, the trial court determined that "the value the property would have had," if Olshan's systems had worked, was $240,000. The trial court discussed the testimony of the real estate broker and the average price per square foot for homes sales. For all of its arguments regarding damages, Olshan does not challenge the trial court's finding that the home would have been valued at $240,000 if the Olshan systems had worked. Accordingly, we will not review that finding on appeal.

Finally, to calculate its final damage award, the trial court subtracted from the $240,000 value a sum representing "the current value" of the property "placed by the assessor" to reach a damage award of only $187,000. By our calculation, the trial court subtracted $53,000 as "the current value" of the property "placed by the assessor." ($240,000 - $53,000 = $187,000). This sum was clearly based on the court's erroneous recitation of the 2017 tax value. Again, the trial court's order stated that the 2017 tax value was $42,000 for the structure and $11,400 for the land. In reality, the tax record showed $2,000 for the structure and $11,400 for the land, for a total value of only $13,400. The evidence at trial does not support a finding that the property had a current value of $53,000 at the time of trial, as placed by the assessor or otherwise.[13]

On appeal, Ms. Maddox contends that *any* deduction for a current value was erroneous. She argues that her loss of value as of 2017 "would be the totality of the $230,000 value [the property] would have had if [it had] been in good condition, less the insurance payment of $15,957.93 from the insurance company that Ms. Maddox received for a total additional damages award of $214,042.07[.]" We agree with Ms. Maddox in this regard. She was forced to abandon the property. She cannot sell it, rent it, build on it, or even legally enter it. As Ms. Maddox suggests, "it was a total loss." Olshan's attorney appeared to recognize this fact during closing arguments at trial, when he stated, "Because of bad luck and, frankly, neglect, *this property has no value*, but that's not because of any intentional misrepresentation of fraud on the part of Olshan." (emphasis added).

We accept the calculation Ms. Maddox proposes on appeal and conclude that the damage award for her pecuniary loss should be modified from $187,000 to $214,042.07. The measure of damages for pecuniary loss is intended "to compensate the injured party for actual damages by attempting to place that party in the same position that he or she would have been in had the fraud not occurred." *Gage v. Seaman*, No. 03A01-9711-CH-00503, 1999 WL 95185, at *6 (Tenn. Ct. App. Feb. 23, 1999); *see also Zaire v. Roshan-*

---

[13] Inexplicably, later in the order, the trial court recited the value of the house in good condition as $230,000 rather than $240,000, as it found initially. We can only surmise that this was a misstatement based on the numbers from the initial calculation ($240,000 - $53,000 = $187,000). However, Ms. Maddox utilizes the figure of $230,000 in her brief on appeal, so we will do the same.

*Far*, No. M2011-00012-COA-R3-CV, 2012 WL 1965606, at *5 (Tenn. Ct. App. May 31, 2012) (explaining that the plaintiff is entitled to recover "such damages as will compensate for the loss or injury actually sustained in reliance on the misrepresentation and to place the plaintiff in the same position the plaintiff would have occupied but for the fraud or if the representation had been true"). We conclude that the compensatory damage award of $214,042.07 proposed by Ms. Maddox serves that purpose. *See Ward*, 870 N.E.2d at 102 n.12 (awarding damages for the pecuniary loss of the cottage valued based on expert testimony of "its condition as of the time of trial").

Ms. Maddox also requests an award of additional damages. She acknowledges that this case "does not neatly fit into the standard benefit of the bargain analysis," yet she suggests that the trial court should have used some combination of the loss in value approach and the benefit of the bargain approach in order to fully compensate her for her losses. Specifically, she argues that she should have been awarded the value of her home as economic loss *in addition to* "benefit of the bargain damages related to the contract." The "benefit of the bargain award" she seeks is $23,700, the price she paid Olshan to install the systems. She explains, "The expectation of Ms. Maddox from her testimony was that she believed the $23,700 would repair her home." Ms. Maddox does not cite to any location in the record to demonstrate that she requested such damages before the trial court. From our review of the record, Ms. Maddox did not request a return of the purchase price in her complaint, her amended complaint, during opening statements at trial, or during closing arguments.[14] As such, she cannot request such an award for the first time on appeal. *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 670 (Tenn. 2013) ("Issues raised for the first time on appeal are waived.").

Finally, Ms. Maddox suggests that she should be awarded $98,800 for mortgage payments she made after 2013 "for a house that she could not live in." She suggests that these damages "were directly incurred as the result of Olshan's conduct." We disagree. Ms. Maddox owed her mortgage payment regardless of Olshan's conduct. To award her both the value of the home and an additional award for her mortgage payments used to acquire that interest would amount to a double recovery.

### F. Punitive Damages

The final issue we address on appeal is Olshan's contention that the trial court erred in awarding punitive damages to Ms. Maddox. The trial court explained the basis

---

[14] Ms. Maddox acknowledges in her brief that she "pursued this case under a theory of deceit or intentional misrepresentation, as rescinding the contract was impossible because you can't unring the bell and save a destroyed house." During closing arguments, her attorney calculated damages as follows: "230 for the loss of value, minus the payments from the insurance company, and plus the payments she made over the last four years for her mortgage and taxes."

We express no opinion as to whether Ms. Maddox would have been entitled to a return of the purchase price if she had pursued this argument in the trial court.

for its award of $15,000 in punitive damages as follows:

> As to punitive damages, the Court finds that there is clear and convincing proof that the Plaintiff is entitled to punitive damages because she is not a wealthy homeowner, her home was her largest monetary investment and it meant a great deal to her. And when reckless contractors . . . convince homeowners that they can place metal spears and piers underneath a house, and that they know what they are doing, when an engineer is required to look at soil where a house has noticeable water problems and that was the reason why the Plaintiff needed this work in the first place, the Court thinks that it's an egregious thing to do to someone, to place their only or their greatest monetary investment, that also has emotional meaning, in peril, and in this case the Plaintiff really has lost her house, the impact on the Plaintiff is great. The Plaintiff is not skilled in building or in correcting water problems. It turns out that the Defendant isn't either, but the Defendant Olshan represented itself as being skilled. The Defendant had time to make things right, particularly early on, and chose not to do so. In fact, just sending someone out there to tighten things. And the Defendant should have known, had it paid attention, that the systems were having no effect whatsoever on the Plaintiff's water problems. The Court understands that the Defendant Olshan profited from the sale, otherwise, why would they be selling these improvements which they tout to the public as solving water problems. The Defendant did not take any remedial action, and did not make any amends. The primary purpose of this punitive damages award of $15,000 is to deter the Defendant Olshan from continuing to sell improvements, that is, the three systems that it is using to solve serious residential problems, when, in fact, they are ineffective without soil tests and without waterproofing and without an engineer's expertise. And the Court finds that this should not have happened.

On appeal, Olshan argues that "because Olshan is not liable for fraud (as detailed above), the Trial Court erred by awarding punitive damages." Olshan maintains that it was not reckless. We have already rejected these arguments and concluded that Olshan did in fact engage in fraudulent and reckless conduct. Therefore, Olshan's challenge to the punitive damage award is without merit.

## IV. CONCLUSION

For the aforementioned reasons, the judgment of the chancery court is affirmed as modified. Costs of this appeal are taxed to the appellant, Olshan Foundation Repair and Waterproofing Company of Nashville, L.P., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE